## R. L. STEPHENS v. STATE.

No. A.-3867. Opininon Filed July 11, 1923.
Rehearing Denied Sept. 15, 1923.
(217 Pac. 1063.)

(Syllabus.)

1. **Witnesses—Defendant Claiming Privilege as to Collateral Matters.** Ordinarily, a defendant testifying in his own behalf, who, on cross-examination, claims his constitutional privilege of refusing to testify to facts that might incriminate him in some other offense, must do so at the peril of prejudicing his own case before the jury in the case then on trial.

2. **Same—Cross-Examination of Accused on Conjectural Matters Improper.** Such cross-examination may be objectionable where the assumed facts incorporated in the questions are merely conjectural, and incapable of proof, when asked for the sole purpose of prejudicing the accused before the jury.

3. **Larceny—Specific Proof of Incorporation of Company Owner not Essential.** Where the information states that the subject of the larceny was the property of the "Gypsy Oil Company, a corporation," specific proof that it was duly incorporated is not essential where there is inferential evidence indicating that the company was in fact a corporation.

Appeal from District Court, Tulsa County; Redmond S. Cole, Judge.

R. L. Stephens was convicted of the larceny of an automobile, and he appeals. Affirmed.

Woodson E. Norvell and Alpha L. Burns, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. R. L. Stephens, plaintiff in error, herein designated the defendant, was convicted in the district court of Tulsa county, at the March, 1920, term of said court, of the larceny of an automobile, and on April 19, 1920, was sentenced to serve a term of five years in the state penitentiary. From the judgment of the trial court he appeals to this court.

The evidence in this case is to the effect that on the 11th day of October, 1919, the Gypsy Oil Company had a new Ford roadster stolen from in front of a paint shop in the city of Tulsa. This roadster was afterwards recovered from the possession of Will Carden and Elton Meadows in Dallas, Tex., in the latter part of November, 1919. Certain changes had been made in the car between the time of its taking and the time of its recovery, among which changes were the replacement of a large steering wheel for a small one, a change in the engine number, some new braces put on, a mirror placed on the windshield, and different tires on the rear wheels. Carden and Meadows were arrested for the theft of the car from the Gypsy Oil Company, and brought back to Tulsa. There, in the presence of the officers, they stated that they came into possession of the car by purchase from a man by the name of Johnson at Beggs, Okla.; that Johnson was an oil field worker. Later they made a different statement, implicating the defendant, and this later statement was the one sworn to by them as witnesses. At the trial they each testified that they came into possession of the car by stealing it from the garage of the defendant Stephens on the Sunday morning preceding Hallowe'en, 1919. This would make the day October 26, 1919. After they stole the car from Stephens they kept it in Tulsa for five or six days before they left with it, during which time they had it in two different public garages, the American Garage and the Hobart Garage. They both stated that the large steering wheel was on the car when they stole it, and also the same tires as when the car was recovered. Each of these witnesses denied that they stole the car from in front of the paint shop on the 11th of October, or had anything to do with the stealing of the car from the Gypsy Oil Company.

On the 11th day of October, 1919, Carden was working for Stephens, who was living on a 15-acre tract of land about

3½ miles east of Tulsa, on the Federal road, engaged in the raising of chickens and hogs and in truck farming. Carden did the milking for him, and helped run the place. The 11th of October was on Saturday, and on this date Carden claimed that Stephens went to town and came back with the Ford roadster which he and Meadows stole from Stephens, and which proved to be the property of the Gypsy Oil Company. Carden claims that Stephens returned home with this car some time between 3:30 and 5 o'clock that afternoon. Carden's is the only direct testimony connecting the defendant with the possession of the car, except that Meadows also testified that the car was taken from Stephens' garage, and that Stephens shot at them as they were leaving his place with the car that morning. This Stephens denies, and also denies that he had anything to do with the original taking of the car.

E. M. Morton, a witness for the state, testified that he had lived in Tulsa about three years; knew the defendant, and also Carden and Meadows; that he lived on the corner of Admiral and Lewis streets, and that Stephens came out there on a Sunday morning late in October and asked him if he had seen the two boys that morning; that witness said he had not, and that Stephens then said, "I have lost my car; the boys have got it." The witness then said, "How do you know?" to which Stephens replied, "Well, I took a shot at one of them." This conversation was not denied by defendant when he was a witness.

Mrs. Iva Meadows, mother of Elton Meadows, testified: That she saw Stephens at her house in the city of Tulsa on the 26th of October, 1919, about 9 or 9:30 in the morning—Sunday morning. That defendant told her that her son, Elton, and the Carden boy had driven his car off that morning about daylight. That she asked Stephens if he was sure that it was

Elton, and Stephens said he was sure. Stephens said he shot at the Carden boy three times; that they had stolen the car. Mrs. Meadows then asked him if the Carden boy did not live with him, and Stephens said he did, but that they were "at outs" at that time, and that the Carden boy was mad at him. That later she talked with Stephens several times over the telephone. That he called her up to know if Elton had come home, or if she had heard of the boys and that she told Stephens that she was sure that they would bring the car back, and that he said that he did not think they would, because the Carden boy was mad at him. That the witness told defendant that she was greatly worried about it, and the defendant assured her at that time that she had nothing to worry about—that he was not going to report it. This conversation was not denied by the defendant when on the witness stand.

J. T. Meadows, the father of Elton Meadows, also testified about a telephone conversation with the defendant. In this conversation witness said that Stephens wanted to know if he knew anything about the boys or the car,, and if they had brought the car back yet. Witness told him that he had not seen the car nor the boys, and asked Stephens if he had reported the theft to the police. Stephens said he had not, and witness told him that he had better go ahead and report it, and defendant said he was thinking about doing it the next day. This conversation was not denied by Stephens when a witness. Neither was the theft of the car from Stephens reported to the police.

The witness D. A. Plank testified that he lived in Tulsa, and was engaged in business in a filling station of the Lindner Oil Company at Admiral and Lewis streets; that he knew Carden and Stephens and Meadows; that he was working at such filling station on Saturday, the 11th of October, 1919,

and also on Saturday, the 25th day of October, 1919; that he saw Stephens nearly every day during that month, but did not remember the exact dates; that he sold gasoline to both Stephens and Carden every few days; that they would often be together; that he saw Stephens driving a Ford roadster that looked like it was nearly brand new in the latter part of October, 1919. In addition, this witness testified as follows:

"Q. Was he driving such·a looking car at the time that Will Carden was with him? A. Yes, sir; I don't know just how—

"Q. And you had seen him driving before that—for several weeks before that you had seen him driving a Ford roadster that didn't look quite so new? A. Well, now, I couldn't say so positive about that. His car was a nice-looking car; I don't know whether you would call it an old-looking car or not.

"Q. Have you ever seen him driving a car that showed it had been out in the dust and mud? A. Yes, sir.

"Q. Ford? A. Yes, sir.

"Q. Did the car that he was driving when Will Carden was with him there in the latter part of October look like it had been in the mud? A. Well, I didn't notice; don't remember about that.

"Q. Well, did it impress you as a muddy car? A. No; I wouldn't call it so.

"Q. Looked like a new car to you, did it? A. Yes, sir; a nice-looking car.

"Q. Have you any records by which you could fix that date? A. No, sir; I couldn't.

"Q. Do you sell him for cash? A. Sometimes I do, and sometimes he will tell me to charge it, and I will just put the ticket in the cash drawer there, and hold it for him, and then when he pays I just—

"Q. You sell him gasoline frequently, do you? A. Yes, sir.

"Q. Used to, did you? A. Yes, sir; I do yet.

"Q. Do you know anything about when a car was stolen from the Gypsy Oil Company—this car in question? A. No; I don't know as I—I don't know.

"Q. Did you ever have a conversation with Stephens with reference to having a car taken from him? A. Yes, sir.

"Q. When was that? A. Well, I don't remember the date; it has not been so long ago.

"Q. Latter part of October, was it? A. Something like that.

"Q. Do you remember when it was with reference to that time that you had seen Will Carden and him come up there, and you would sell them gasoline? A. Well, it was along just about that time; yes, sir.

"Q. Next day, or such a matter? A. Possibly so; it was just about that time, anyway.

"Q. Well, was that before or after he had told you about this car being stolen that you had seen him and Will come up there and get gasoline together? A. Oh, that was a day or two before; possibly a day or possibly two days.

"Q. Before he told you? A. Before he told he had lost the car.

"Q. The getting of gasoline was a day or two before he told you about losing the car? A. Yes, sir.

"Q. Now, what did he say about losing that car? A. Well, I don't know that I can say just—I think the first thing he asked me about it was he asked me if I had seen Eney; we call him that—

"Q. Who did he mean by Eney? A. That is the boy right there.

"Q. Will? A. Yes.

"Q. All right. A. And I told him I hadn't, and he was looking for him, and told me something about missing his car.

"Q. What did he say about missing his car? A. Well, he said his car was stolen.

"Q. Did he say why he was looking for Eney? A. Well, he left the impression that he thought Eney had got it.

"Q. What did he say about any shooting? A. Well, he didn't say anything; he didn't say anything about any shooting at that time.

"Q. Did he at some other time? A. I don't think I heard him say anything; he didn't say anything about any shooting at that time.

"Q. Did he at some other time? A. I don't think I heard him say anything about shooting, himself, but Carden was telling me later about some shooting.

"Mr. Sykes: I object to that as incompetent, irrelevant and immaterial.

"Mr. Hunt: We confess it.

"The Court: Sustained.

"Mr. Hunt: I confess all that about what Will Carden said. I don't want it in if you don't.

"Q. And Stephens had already told you that Eney had taken his car? A. Well, he left the impression that he thought Eney had got it.

"Q. But how did you happen to be talking to Eney about this car? A. Well, he just came in the office and sat down, and I wasn't busy.

"Mr. Sykes: Object.

"The Court: Sustained.

"Mr. Hunt: How much do you want to object to?

"Mr. Sykes: I object to all the conversation not made in the presence of the defendant.

"Q. When did you see Stephens again? A. Well, I don't know; two or three days after that.

"Q. Did you talk to Stephens when you saw him next? A. I don't know whether there was anything said about the car at that time.

"Q. Did you tell him you had seen Eney? A. No; I don't believe I did."

### Cross-Examination:

"Q. Now, the time that you saw this car that looked like a brand new car that Eney and Stephens were with, was that the afternoon of the day before the next day Stephens told you that his car had been stolen? A. Yes; it was that evening or the day before; possibly the evening before.

"Q. And this looked like a brand new car, didn't it? A. Yes; it looked like a brand new car.

"Q. And the next day he came up there and told you that these boys had stolen his car? A. It was either the morning after that, or possibly it was two days before that we filled that car; it was a day or two—something like that.

"Q. It was on Sunday morning, wasn't it? A. It was on Sunday morning.

"Q. That he came up there and told you they had stolen his car? A. It was Sunday morning that he came up there and told me they had stolen his car."

Another circumstance against the defendant was that the number of the stolen car had been changed to the identical number of a Ford roadster that Stephens had bought from the same Ford agency in the month of May, 1919. Another circumstance was that this roadster that Stephens had bought in May, 1919, had been considerably altered in appearance, Stephens having had a touring car body put on it. This was done a short

time after the Gypsy Company roadster was stolen. Also, Stephens had this car at a public garage for repairs at the time the Carden and Meadows boys claim they stole the Gypsy roadster from Stephens' private garage. The tires from the Gypsy car must have been placed on the Stephens car prior to October 25, 1919, the date Stephens took his car to the garage for repairs. Stephens attempted to explain the presence of these tires on his car by stating that he had given $32 in money to Carden on the 20th day of October, 1919, to purchase two tires for the rear wheels of his car, and that the tires were put on the car by Carden. The only corroboration of this is by Stephens' sister-in-law, who claimed to have been at Stephens' house at the time Stephens gave Carden the money.

Stephens was not arrested and charged with this offense until some time after Carden and Meadows had been returned from Texas, and apparently not until they had made their second statement, which implicated Stephens in the original taking of this car.

The strongest circumstances in Stephens' favor is that he drove down to the courthouse at the time of the preliminary hearing of Carden and Meadows in his own Ford car, with the stolen tires from the Gypsy Oil car on the rear wheels. While it can be truthfully said that such conduct was not indicative of guilt, yet, on the other hand, it should be remembered that automobile tires of a certain make and size have no distinctive markings of identification other than the serial numbers impressed on such tires, and that such numbers cannot be distinguished except upon close examination. Another circumstance that might be said to indicate innocence is the fact that Stephens never notified the police authorities of the loss of any car by him; but this circumstance may also be urged as indicating guilt, because if Carden is telling the truth Steph-

ens had previously stolen this car from the Gypsy Oil Company, and it would have been suicidal on his part and a virtual admission of possession of the car for Stephens to have reported the subsequent larceny of the car from his possession. So that, while ordinarily the failure to promptly report the theft of the car would indicate that no car had been feloniously taken from the person failing to so report it, on the other hand, under the circumstances as detailed by Carden, the failure to report would not indicate any such facts, but might be used to indicate a consciousness of guilt on the part of Stephens of the original taking of the car on October 11, 1919. This view is strengthened by the testimony of Mr. and Mrs. Meadows to the effect, first, by Meadows, that he urged Stephens to report the theft of the car to the officers, and then, by Mrs. Meadows, that Stephens told her she need not worry; that he was not going to report it. Stephens' failure to deny either of these conversations strengthens the view that the failure to report the theft of the car to the officers was because of his guilt of the original taking thereof. In other words, Stephens seems to have preferred to rely upon his ability to quietly regain possession of this car from Carden and Meadows, by whom he must have known it was taken from him, if the uncontradicted testimony of the witnesses Mr. and Mrs. Meadows, E. M. Morton, and W. H. Plank is to be believed.

The record discloses some irregularities occurring in the course of the cross-examination of the defendant by the county attorney. Under the peculiar circumstances, as shown, portions of this cross-examination were objectionable. Ordinarily a defendant testifying in his own behalf, who claims his constitutional privilege of refusing to testify to facts that might incriminate him in some other offense, must do so at the peril of prejudicing his own case before the jury in the case then on trial. The facts sought to be elicited by this cross-examina-

tion, tending to show that the defendant had previously been implicated in other offenses, if true, could have been established by record or other independent evidence; but the state made no effort to make such proof. These cross-interrogatories were probably intended to force the defendant to claim his constitutional privilege, and so prejudice the defendant's cause in the eyes of the jury, and the manner of so doing under the circumstances here was of doubtful propriety. But, since the record as a whole points to the guilt of the defendant, and since he received the minimum penalty prescribed by law, these irregularities are not of such a grave nature as to warrant a reversal of the judgment of conviction.

The information alleges that the stolen automobile was the property of the Gypsy Oil Company, a corporation. In cases of larceny the ownership of the property must be alleged and proved. The earlier decisions are to the effect that such ownership must be proved as alleged, and that, if the state incorporates an unnecessary allegation as to ownership in the indictment or information, it is necessary to prove such allegation where it has reference to the ownership of the property stolen. The weight of modern authority appears to be that such strict proof is not absolutely essential. There seems to have been no controversy in this case on the question of whether the Gypsy Oil Company was or was not a corporation. All the witnesses testified that the car stolen was the property of the Gypsy Oil Company, and in designating the owner of the stolen property all the witnesses, without exception, name it the Gypsy Oil Company, a name ordinarily applied to corporations, and, in the absence of evidence to the contrary, it would be so understood. The witnesses also testified as to the various departments of the company and to their duties respecting the company and its departments; so that, while there is no direct evi-

dence nor reputation evidence to the effect that the Gypsy Oil Company is a corporation, the name applied, to wit, Gypsy Oil Company, indicates that it is a corporation, and the testimony of the witnesses concerning their duties in respect to such company and its various departments, as employes, indicates a corporate organization, sufficient to support the verdict and judgment. 7 R. C. L. 37, 38, notes and annotations; 18 Ann. Cas. 1121; Ann Cas. 1912A, 969.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.