## HENRY HINKLE, Jr., v. STATE.

No. A-8620.  March 16, 1934.
Withdrawn, Corrected, and Refiled April 14, 1934.
(32 Pac. [2d] 96.)

Ben F. Williams, Homer Cowan, and T. R. Benedum, for plaintiff in error.

J. Berry King, Atty. Gen., and Sam Lattimore, Asst. Atty. Gen., for the State.

CHAPPELL, J. Plaintiff in error, referred to hereafter as defendant, was convicted in the district court of Garvin county of the crime of robbery with firearms, in the robbery of the First National Bank of Lindsay, and his punishment fixed by the jury at imprisonment at hard labor in the state penitentiary for a period of 20 years.

It is first contended there was no competent legal evidence to corroborate the admitted participants in the alleged robbery, which tended to connect defendant with the commission of the crime.

The evidence of the state was that the robbery was committed by E. L. Warden, Joe Warden, Ewell Brookshire, Buster Murphy, and Pete Baxter, with defendant aiding, abetting, and assisting them; that the car in which the robbers traveled to commit the offense was owned and furnished by Homer Bramble and driven by E. L. Warden; that Warden got the Bramble car off the streets of Lindsay and drove it out west of town; that defendant took those who entered the bank to commit the offense in his car to the appointed rendezvous; that they left his car at that point and entered the Homer Bramble car, which was driven immediately back to Lindsay by Warden, where Murphy, Brookshire, Warden, and Etheridge entered the bank, and by force of arms and through fear of the bank officials obtained $5,500 in currency and a large amount of negotiable notes and bonds; that those entering the bank forced two of the bank officers and two mechanics who happened to be in the bank to accompany them as a shield to protect them in their escape; that the robbery was planned by the defendant at his home, and that all the parties participating in the robbery were induced by defendant to engage therein; that defendant not only furnished his car, but furnished the weapons used in the commission of the offense, concealed the robbers at his home after the crime was committed, received the proceeds of the robbery from the robbers, and otherwise generally engaged in the commission of the crime.

That two days before the robbery, Claude Roberts, E. L. Warden, Pete Baxter, Robert Etheridge, and defendant made a trip to Oklahoma City, and visited the home of Moman Pruiett, where defendant discussed the robbery of the two banks at Blanchard and the one at Lindsay with Pruiett, and that they obtained one of the

guns used in the robbery and introduced in evidence by the state from Pruiett.

That the money received from the Lindsay bank was later hid in the home of George Hinkle, a brother of Henry Hinkle, who lived about two miles from Lindsay.

Joe Warden testified that after they brought the money to defendant's house, defendant and Floyd Garrett left with it; that the next time he saw the money was in Oklahoma City, at the home of Jimmie Mathers, attorney, where it had been delivered; that the one dollar bills were in bundles containing $100, held together by paper bands; that the five dollar bills were held together by little stickers and were in $100 bundles; that the ten and twenty dollar bills were held together by little envelope clamps; that there was $2,100 in currency; that Mr. Mathers gave him $22 out of the money, which he used to buy himself a suit of clothes, shoes, cap, and tie.

That there was a pair of black gloves used in the robbery that were later identified as belonging to defendant.

The state admits its witnesses Floyd Garrett, Robert Etheridge, E. L. Warden, Ewell Brookshire, Joe Warden, and Claude Roberts were accomplices who actually participated in the robbery or aided and abetted the same, and that therefore their testimony must be corroborated by other independent evidence tending to connect defendant with the commission of the crime.

All of these witnesses testified the robbery was planned at defendant's home, and was carried out by them under his leadership and direction. If there was no other evidence in the record tending to connect defendant with the commission of the offense, his contention would be good.

E. L. Warden testified he accompanied defendant to Oklahoma City, where defendant purchased a 32-20 Winchester rifle and a .34 caliber pistol from one Anderson, who conducted a pawn broker business in Oklahoma City. Anderson, though he would not undertake to identify any one as the purchaser, stated he sold the guns to a man giving the name of Henry Hinkle. Three disinterested witnesses testified that defendant was in Oklahoma City on the day these guns were purchased, and Edith Shafer testified the rifle looked like a gun defendant had in his car at her home about 30 days before the offense was committed. These guns were actually used in the robbery, and were later found by the officers where they were hidden by one of the robbers. The state's Exhibit No. 4 was a .38 caliber Colts police positive pistol; this gun was used by Ewell Brookshire in the actual robbery. Brookshire testified he got the gun at defendant's house and that night, after the robbery, delivered it back to Hinkle. This gun, a few days later, was found in defendant's brief case in his office. Defendant admitted in his testimony he owned this gun, but denied it was used with his consent in the robbery.

Joe Warden testified defendant told Pete Baxter to get all the bonds and notes, and Baxter carried out instructions and demanded of Costello, one of the officers of the bank, the notes and bonds. Costello testified defendant had some personal notes in the bank at the time of the robbery.

Mrs. Clarence Burford testified she saw Roberts and Etheridge the day of the robbery, near the place of the rendezvous, in a car like defendant's. Defendant did not deny that his car was used on this trip, but explained it by saying he had loaned it to Etheridge to drive to the country.

Charley Denson testified defendant came to his garage just before noon, gave him a quarter, and asked him to buy some roofing nails; that he purchased the roofing nails and brought them back to his place of business and left them on a table; that no one was there but defendant; that immediately after his return some parties came in needing some work done on their car, and that he did not see defendant after that time nor know what became of the nails.

Garrett testified defendant told him there would be nails in the car to be thrown out on the road by the robbers as they fled, to hinder the officers, if they were followed. Nails of this description were actually thrown from the car after the robbery.

In Johnson v. State, 52 Okla. Cr. 86, 2 Pac. (2d) 601, this court said:

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial."

In Brown v. State, 52 Okla. Cr. 110, 3 Pac. (2d) 237, 238, this court said:

"Section 2701, C. O. S. 1921, while providing that a conviction cannot be had upon the testimony of an accomplice unless such testimony is corroborated, only requires such corroboration as tends to connect the defendant with the commission of the crime."

In Underwood v. State, 36 Okla. Cr. 21, 251 Pac. 507, 509, this court said:

"The law prescribes no standard for the strength of the corroborating evidence, and there is a failure to corroborate only if there be no evidence legitimately having that effect."

In Key v. State, 38 Okla. Cr. 169, 259 Pac. 659, this court said:

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

Measured by the rules laid down in these cases, there was an abundance of evidence to corroborate the accomplice and warrant the jury in convicting defendant.

Defendant next contends the state failed to prove the incorporation of the First National Bank of Lindsay, and that such failure was fatal to the state's case.

In United States v. Amedy, 11 Wheat. 392, 409, 6 L. Ed. 502, the Supreme Court of the United States, in an opinion by Mr. Justice Story, said:

"This is not the case where a suit is brought by the corporation to enforce its rights, where, if the fact of its legal existence is put in controversy upon the issue, the corporation may be called upon to establish its existence. * * * The case here is of a public prosecution for a crime, where the corporation is no party, and is merely collaterally introduced as being intended to be prejudiced by the commission of the crime. Under such circumstances, we think, nothing more was necessary for the government to prove, than that the company was de facto organized, and acting as an insurance company and corporation. The very procurement of a policy by the prisoner, to be executed by the company, was of itself prima facie evidence for such a purpose. In cases of the murder of officers, it is not necessary to prove that they are officers, by producing their commissions. It is sufficient to show that they act de facto as such. In cases of piracy, it has been held sufficient to establish the proprietary title to the ship, by evi-

dence of actual possession of the party claiming to be owner."

In Guthery v. State, 24 Okla. Cr. 183, 216 Pac. 948, this court said:

"Where in an information for burglary it is alleged that the building burglarized was the store building of the Farmers' Supply Company, a corporation, specific proof that such supply company was duly incorporated was not essential where there is evidence inferentially indicating such incorporation and there was no controversy on this issue."

To the same effect are Stephens v. State, 24 Okla. Cr. 351, 217 Pac. 1063; Gunter v. State, 16 Okla. Cr. 476, 184 Pac. 797.

The evidence in the case at bar shows the First National Bank of Lindsay, Okla., was engaged in the business of a banking institution, and had been engaged in such business for several years; that James Charles was bookkeeper, John Costello, Jr., a teller, John Costello, Sr., cashier, W. J. Garrett, vice-president, and R. C. Wooten, president. This evidence of the state was sufficient to inferentially establish that the First National Bank of Lindsay was duly incorporated.

Some contention is made that the robbery may have been with the consent and approval of the officials of the bank. Some of the robbers testified defendant told them he had it fixed with the bank so they never would be identified, but there does not appear to be anything in the robbery itself, or any of the evidence connected with it, to indicate that the robbery was with the connivance of the men who were in the bank and held up at the point of guns, or that it was with the consent of any official connected with the bank. Though, even if that condition

existed, the connivance of such officials would not have protected defendant.

It is next contended the court erred in permitting the state to introduce in rebuttal the testimony of three witnesses, who stated they saw defendant in Oklahoma City on the night of December 19, 1932, which was the time Claude Roberts and Robert Etheridge testified they obtained the gun from Moman Pruiett. Defendant in his testimony denied he was in Oklahoma City at the time of the purchase of the rifle and pistol from Anderson, or the obtaining of the gun from Moman Pruiett. It was proper for the state in rebuttal to show, if it could by disinterested witnesses, that defendant was in Oklahoma City on December 19th, as tending to corroborate the testimony of the robbers as to where they procured some of the guns used in the commission of the offense.

Other errors are complained of, but they are not of sufficient merit to require a special discusson.

The evidence being sufficient to support the verdict of the jury, and no error appearing sufficient to require a reversal, the cause is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.