## VASCO GOINGS v. STATE.

No. A-9892. March 25, 1942.

(124 P. 2d 280.)

R. A. Wilkerson, of Pryor, for defendant.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., and T. L. Marteney, Co. Atty., and

Ernest R. Brown, Sp. Counsel, both of Pryor, for the State.

BAREFOOT, P. J.   Defendant, Vasco Goings, was charged jointly with Huse DeArmond in the district court of Mayes county with the crime of robbery.   He demanded a severance which was granted, was tried, convicted, and sentenced to a term of ten years in the penitentiary, and has appealed.

This case was first set for oral argument on the 2nd day of February, 1941.   At that time oral argument was presented by counsel for defendant and by an Assistant Attorney General, and the case was submitted for consideration of the court.   After an examination of the record, an order was entered that this case should be reset for oral argument upon the merits, and that counsel who represented the state at the trial of the case and also counsel for defendant be present and present the same.   It was set for March 5, 1942, and at that time was fully presented and the case was again submitted. This brings us to a review of the testimony offered as revealed by the record.

Defendant, Vasco Goings, was charged jointly with Huse DeArmond with robbery of one Hugh Creech on the 11th day of April, 1939, in Mayes county.   A severance was granted and defendant Vasco Goings was first tried and convicted as above stated.

The prosecuting witness was a man 76 years of age. He was living alone as a recluse in a small one-room house in the country about 3½ miles east of Salina in Mayes county.   Defendant, Vasco Goings, lived with his father on a farm about 3½ miles distant from where Hugh Creech, the prosecuting witness, lived.   By the road it would have been a distance of eight or ten miles.   The day on which defendant was charged, April 11, 1939, the de-

fendant had been tried in the district court of Delaware county in some criminal case, the exact crime not being shown by the record. The trial of this case continued for two days. On that date he was acquitted by the jury. At about 5:30 in the afternoon he returned to his home from Jay, the county seat of Delaware county, and accompanying him was one of his witnesses, Sam Taylor, whom he had taken to Jay for his trial on that day. About 30 minutes prior to his arriving home, Alex Goings, the father of defendant, and Donas Douglas, a boy 14 years of age and a nephew of defendant, returned to the home from Jay where they had also attended defendant's trial. It being a cold day, a fire was started in the stove, and the defendant and Donas Douglas, his nephew, began the doing of the chores, among which was the milking of the cows. It was after dark when this was finished, and Donas Douglas returned to the Alex Goings home with his milk, and defendant took his milk to the home of his wife and two children. He was living separate and apart from his wife, they having been divorced, but she was living in a house on the same premises with the children.

The witness Sam Taylor, who was a disinterested witness so far as the record is concerned, remained at the Alex Goings home during the night of April 11, 1939. In that home during the night was Alex Goings, father of the' defendant, Sam Taylor, Donas Douglas and defendant, Vasco Goings. They all testified that the defendant, Vasco Goings, slept in the same bed with the witness Sam Taylor and at no time did he leave the house or the premises, and that he returned there from doing up the chores and taking the milk to his wife's home sometime between 8 and 8:30 o'clock.

Just as defendant with Donas Douglas started to doing the chores, Calvin Owens and his wife Mary Owens,

who were farmers and lived about one-half mile from the Alex Goings home, came there and they saw the defendant, Vasco Goings, with his milk buckets. They remained at the Alex Goings house until just a little after 8 o'clock, at which time they returned to their home. Mr. Owens thought that they returned home "sometime between 7:30 and 8 o'clock." Mrs. Owens said: "It was to close to 8 o'clock. I know it was dark." Soon after they arrived home they saw a man whom they took to be Martey Phelan pass by their house on a horse. He was riding along whistling. They could not positively identify him, but they knew him and in their best judgment it was he.

The witness Martey Phelan testified for the state that he lived about 3½ miles east of Salina and about that far from the Goings home, and about a quarter or half a mile from the home of Hugh Creech, the prosecuting witness. The distance from his home to the Goings home by the road was some eight or ten miles. That he went to the Alex Goings home on the night of April 11, 1939, for the purpose of seeing the defendant, Vasco Goings, about trading for a horse. That he went through the country on horseback and he thought he arrived there something like 8:30 and stayed about 30 minutes and left. That the defendant was not at home while he was there, and on cross-examination, he testified:

"Q. When you went away you rode off on your horse? A. Yes, sir. Q. Tell us whether or not after you got started you heard some one calling for you? A. It sounded like somebody said, 'Wait a minute, Martey.' Q. 'Wait a minute, Martey.' You know who that was? A. It sounded like Vasco,' but I don't know whether it was or not. Q. Well, you know his voice, don't you? A. Yes, sir. Q. And do you tell the jury in your judgment that was Vasco's voice calling you? Mr. Brown: Object to that, the witness just testified that he didn't know whether it

was his or not. The Court: Overruled. Mr. Brown: Exception. By Mr. Wilkerson: Q. You may answer, Martey. A. Hey? Q. You may answer the question, was this Vasco's voice calling you to wait a minute, in your best judgment? A. Yes, sir. Q. And how long have you known Vasco? A. About all my life. Q. You didn't go back? A. No, sir. Q. Why didn't you go back? Mr. Brown: Object to that as incompetent, irrelevant, and immaterial, doesn't tend to prove or disprove any of the issues involved in this lawsuit? The Court: Overruled. Mr. Brown: Exception. By Mr. Wilkerson: Q. You may answer, Martey? A. Well, sir, I was away down the road, and I didn't think there was any use. I thought I could see him—he could see me some other time. Q. Yes, you could see him another day? A. Yes, sir."

We have outlined the testimony revolving around the defendant on the date that he was charged. Let us now go to the scene of the home of the prosecuting witness, Hugh Creech. This old gentleman 76 years of age was living in a small one-room boxed house alone about 3½ miles east of Salina. During the day of April 11, 1939, he had worked around his place, and late in the evening he had done his chores, cooked his supper and sat down for about "an hour or so," and lit his lamp and lay down across the bed with his clothes on and rested. He had a small "King" heater in his room, and when he waked up he put some heavy green wood in the stove, and then pulled off his clothes, blew out the lamp and went to bed. He did not know the exact time, as he didn't have a timepiece. He was asked:

"Q. Now, after you laid down the second time, Mr. Creech, do you have any idea of about how long you laid there before something happened, if anything did happen? A. No, I don't have much of an idea—never went to sleep."

He further testified:

"Q. Well, now, just tell the jury just what happened there, Mr. Creech, tell the jury, and tell them so they can hear you. A. I was just lying there in my bed and something come against the door, and the door flew clear open, clear open, and those fellows stepped right up in front of that stove, in the light of it. Q. Who were those fellows? A. Vasco Goings and Huse DeArmond. Q. Do you see either one of those in the courtroom now? A. Yes, sir. Which one? A. Vasco. Q. Vasco Goings? A. Yes, sir. Q. Is Vasco Goings the defendant sitting over there ? A. Yes, sir. Q. He is one of the parties? A. One of the parties. Q. Then, what happened after they stepped up in the door, Mr. Creech? A. Vasco grabbed me, and I made an effort to try to get loose from him, and he hit me over the head with a flashlight and then got hold of me to where I couldn't do anything, and I caught hold of his flashlight, and after that twisted around with him, and I don't know whether I cut the light off, or whether he did. Mr. Wilkerson: Object to that as not responsive to the question. By Mr. Brown: Q. Now, Mr. Creech, in scuffling with the flashlight, was there any time during that time—was the flashlight on or off a part of the time? A. It was on and right off. Q. How many times did it go on? A. Twice. Q. Twice, while scuffling? A. Yes. Q. And was it in such position at any time that you could recognize or see the face of the party you were scuffling with? A. Yes. Q. Did he have any part of his face covered? A. Yes. Q. What part of his face did he have covered? A. From his nose down. Q. And do you know who it was that came in the door—when you see them first come in the door? A. Yes, yes, I knowed them when they first stepped up in the door. Q. Now, you recognized them and knew positively who they were? A. Yes. Q. Now, what did the other defendant, Huse DeArmond, do when he got up in the door? A. He just run around to the walls for the guns, grabbed them and took them out of doors. Q. Did the other defendant have a flashlight? Yes, both had a flashlight. The Court: I didn't get that—did both have a flashlight? A. Both had a flashlight. By Mr.

Brown: Q. Then, how long was Huse DeArmond gone after he went out of doors with the guns? A. Didn't seem to me like, not over ten or fifteen seconds, just right out and right back. Q. And what did he do when he came back in? A. He went to searching for my pants. Q. Did he find them? A. Yes. Q. Where did he find them? A. Found them lying across the foot of the bed. Q. And what did he do when he found them? A. Picked them up and taken what money I had in my pockets out. Q. Did you have any money in your pockets? A. Yes. Q. Did you have it all in one pocket or more than one pocket? A. I had it all in one pocket in a billfold. How much did you have, Mr. Creech? A. I had a $20 bill and a $5 bill, seven $1 bills, two dimes and two nickels, and I don't know, a few of those mills, four, five or six, something like that, in the billfold. Q. What did he do with your trousers after he searched your pockets? A. Throwed them back on the bed. Q. And what became of the billfold? A. Took it with the money. Q. Then, what did he do after that happened, after he threw your trousers down, what did he do then? A. Vasco pulled me off the bed and come on around, and Huse caught my feet, and Vasco took me head foremost out of the front door. Q. And what direction did they take you? A. When they got out of the door? Q. Yes. A. They went pretty near out north, a little east of north, up on the road. Q. And about how far is that to the road from your house—started out to the road? A. It is about 40 yards. Q. About 40 yards? A. Yes. Q. Then, which way did they go from there? A. Turned right back west. Q. And about how far did they carry you then? A. About 45 or 50 yards west. Q. Is there a creek there by your place? A. Yes, went across the creek. Q. Is there any water in the creek—was there? A. No, it was dry. Q. And where did they carry you with reference to the east or west bank of the creek? A. Turned me loose at the west bank of the creek. Q. Then what did they do? A. Knocked me down. Q. How did they put you down when they put you down, if you remember? A. Just kind of straightened me up and hit me—knocked me down.

Q. You know which one it was that hit you? A. No, I don't; that is one thing I don't know, which one. I know one of them hit me, and I know I fell. Q. When you fell, what did you do? A. I scrambled around, and when I got up on my knees, they was running up the road. Q. Then, what did you do? A. I went back to the house as quick as I could, but I couldn't get back very fast— Mr. Wilkerson: (Interrupting) We object now to any voluntary statement. The Court: Just answer the question. By Mr. Brown: Q. What kind of clothes did you have on, Mr. Creech? A. Just a union suit. Q. And what was the condition of the weather that night as to being warm or cold? A. It was cold. Q. Then, after you got back, what did you do in the house? A. I just set down there in the rocking chair by the stove and stayed there until daylight. Q. Now, was there anything else gone from your house except the money out of your pocket? A. Nothing. Q. Was there anything else taken away from your house besides your money? A. Well, the guns was gone."

He then testified to going to town early in the morning and seeing Charlie Whiteday, who was a constable, and of going to the office of the justice of the peace and phoning for the sheriff and swearing out a warrant for the defendant and Huse DeArmond charging them with the robbery. That on that evening the constable and city marshal of Salina came to his home and found his guns out close to his house, and they were returned to him. He also testified he had known the defendant, Vasco Goings, for some five years and had frequently seen him.

On cross-examination he testified as to the length of his room and of the location of the stove and bed. This was all of minor importance. As to the time of the robbery, he said:

"Q. Well, do you have a judgment as to the time? A. I would think it would be about around about 9 o'clock, that's all, because I ain't got no clock, and I ain't got no watch."

He further testified:

"Q. Now, Mr. Creech, when this man entered your house—these men entered your house, what did you do first? A. The first thing he got hold of me. Q. And how did they move towards you with reference to moving fast or slow? A. They moved fast. Q. Did they come on a run? A. Mighty near a run, just about as fast as they could come without running. Q. And were they moving fast when they entered the room? A. Yes, sir. Q. They forced the door open, and moved immediately to the bed? A. Yes. Q. And moved rapidly? A. Yes. Q. Now, did they come between the stove and the east wall, or did they run around the stove? A. They come between the stove and the end of the bed."

With reference to the blindfolds, the witness said:

"Q. I will get you to tell us about the rags you say these men had on their faces. What kind of rags were they? A. They was white looking rags. Q. Were they large or small? A. I couldn't tell you about that. Q. Now, didn't you testify at the preliminary hearing that they were large rags? A. I think I must have told them that they were handkerchiefs, but I don't know. Q. How were they fastened around the neck? A. Just tied around here (indicating). Q. Did the nose come over the ears (indicating)? A. No. Q. Could you see the ears? A. Yes. Mr. Wilkerson: Your Honor, excuse me just a minute— The Court: Anything further? Mr. Wilkerson: Yes, your Honor, just a minute. Now, do you know whether or not the handkerchiefs tied around the back of their heads? A. I don't know whether they were tied back of their heads or not; it was over their face. Q. Now, would you mind showing the position—(indicating) this is a clean handkerchief, Mr. Creech. A. Clean— Q. That's right. Would you mind showing the jury just how it was over their faces—put on their faces? A. (Indicating). Q. Would you mind telling the jury whether it was over their nose? A. Just up to the nose (indicating)."

He further testified that he had previously been convicted of a violation of the prohibition law and had served a sentence for the same.

Mr. Herrington, the city marshal who made an examination of the premises, testified as to the finding of the guns, and on cross-examination he said:

"Q. Did you make an examination for tracks, Mr. Herrington? A. Yes, sir, we did. Q. And what kind of tracks did you observe? A. Well, there was one track that looked to be about a No. 7, ladies' shoe, and one that looked to be a work shoe, about a No. 11 or 12. Q. One of them was very large and the other one was small, is that right, Mr. Herrington? A. That's right. Q. Those tracks were pointed out by Mr. Creech, or do you recall? A. I don't recall that Mr. Creech was with us when we observed the tracks. Q. Now, did you ever have occasion to observe the kind of shoes that Vasco Goings wears? A. I don't believe I ever did. Q. Those tracks were plain there, were they, Mr. Herrington? A. Yes, sir, they were. Q. And could have been seen? A. Yes, sir."

J. O. Turner testified that he had a conversation with Mr. Creech, the prosecuting witness, and that Mr. Creech told him that the parties who robbed him "had a white handkerchief, a white cloth or something over their faces, and he could only see their eyes, or something to that effect—as well as I got it."

Dorothy Bryan, the daughter of Mr. J. O. Turner, testified that on the 12th or 13th of April, 1939, just shortly after the robbery, she heard the prosecuting witness, Mr. Creech, say: "It was tied on along here (indicating) and his hat was pulled down just so you could see his eyes."

Bud Gann, a witness for defendant, testified to a conversation with prosecuting witness just prior to the

trial in which he stated: "If he knowed who it was he would get his gun and shoot them."

Martey Phelan, who testified for the state, was called by defendant as a witness and testified that he had recently had a conversation with prosecuting witness and that he said: "If I knowed who done that hijacking, I would kill them." He also said the prosecuting witness, Mr. Creech, said: "He says if I come up here and testify that Vasco—it was Vasco—if I would come up here and testify that, it would help him." He further testified:

"Q. Did he say what testimony would help him? A. Yes, sir. Q. What was it? A. He said if I would come up here and swear that Vasco was—that he had give him some money. Q. He would give you money? A. He would. Q. Who do you mean? A. Mr. Creech."

One witness testified that the reputation of Hugh Creech for truth and veracity was bad. Another witness was questioned in regard to this, and when finally asked if he knew the reputation of Mr. Creech for truth and veracity said: "I wouldn't want to," and was excused.

The defendant as a witness in his own behalf testified as follows:

"Q. What is your name, please, sir? A. Vasco Goings. Q. You are the defendant in this case? A. Yes, sir. Q. How old are you? A. 34. Q. Where do you live? A. I live seven miles northeast of Salina. Q. Do you live on any highway? A. No. 20. Q. How far is it, on highway No. 20 to where you live, please, sir? A. I didn't get you. Q. How far is it on highway 20 from Salina, to where you live? A. Oh, it is about seven miles. Q. You know about where Mr. Creech lives? A. Yes, sir. Q. And does he live on the same highway that you live on? A. No, sir, he lives east of Salina. Q. What road is that known as? A. Well, it is the road that goes up to Salina, up Salina creek. Q. Do you know whether or not that is the Kenwood Road that runs out over the hill

there? A. Yes, sir. Q. In going from your place to Creech's home, in a car, how would you go? A. Well, I would go to Salina and turn east. Q. And how far would that be from your house to Mr. Creech's house? A. About ten miles. Q. Uh-huh. Mr. Goings, you have heard the testimony of Mr. Creech about your being at his house on the night of April 11, 1939? A. Yes, sir. Q. State whether or not you were there then? A. I never was there at Mr. Creech's since he has moved down there. Q. You were never there since he has moved there? A. Never there since he has moved there. Q. Tell the jury whether or not you had anything in the world to do with hijacking Mr. Creech? A. I did not. Q. Did you have anything to do either directly or indirectly of sending somebody up there to hijack him? A. No, sir. Q. Did you go into his house with a cloth tied around your face, and push the door open and jump on him, and beat him with a flashlight, or anything else? A. No, sir. Q. Did you drag him out of the door, and drag him down to the creek, and hit him in the head, and leave him out there and go off and leave him? A. No, sir. Q. Do you know about where Mr. Creech lives? A. Well, right about, yes. Q. Do you know how he acquired that land that he owned? Mr. Brown: We object to that as incompetent, irrelevant, and immaterial. The Court: Sustained. By Mr. Wilkerson: Q. Did you have anything to do with selling the land to him? Mr. Brown: Object to that, if the Court please, as incompetent, irrelevant, and immaterial. By Mr. Wilkerson: Q. I will put it this way: Are you acquainted with the tract of land that he owns? Mr. Brown: Object to that, as incompetent, irrelevant, and immaterial, if the court please. The Court: Overruled. Mr. Brown: Exception. The Court: It might be and might not be. By Mr. Wilkerson: Q. Now, since Mr. Creech has had his house built, have you ever been on that tract of land? A. No, I have not. Q. Where were you on the 11th day of April, 1939? A. I was at Jay. Q. What were you doing up there? A. I was up there in court. Q. In court? A. Yes, sir. Q. Were you being tried? A. Yes, sir. Q. Where were you on the 10th? A. I was

at Jay. Q. Are you acquainted with Houston DeArmond? A. Yes, sir. Q. Did you see him on the 11th day of April? A. I did not. Q. Did you see him on the 10th? A. No, sir. Q. How long had it been since you had seen Huse DeArmond on the 11th day of April, 1939? A. Oh, I judge around two weeks. Q. Did you go anywhere with Huse DeArmond on the evening or night of April 11, 1939? A. No, sir. Q. What time did you get home from Jay, Mr. Goings, on the night of the 11th of April? A. Well, it was about dark—between sundown and dark, I judge. Q. And when you got home, what did you do first? A. Well, the first thing I warmed by the fire. It was cold and I went in the house. Q. Then, what did you do? A. I think I helped to get in some wood and milked—about all I did, practically. Q. Now, when you got there, did anybody help you milk? A. Yes, sir. Q. Who? A. Donas Douglas, my nephew. Q. When you finished milking, where did you go? A. Well, I taken some milk down to Marie Goings, to my kids. Q. That was Marie Goings? A. Yes, sir. Q. She was your wife? A. Used to be. Q. Did you live with her at the time? A. No, sir. Q. You were divorced from her, were you? A. Yes, sir. Q. And upon whose land was she living? A. Well, it belonged to my father. Q. Was she living there near your father's house and where you were living? A. I was living in the house with my father. Q. State whether or not it was your custom to take the milk down to your children. Mr. Brown: Object to that, if the Court please, as incompetent, irrelevant, and immaterial. The Court: Overruled. Mr. Brown: Exception. A. Yes, quite often I would take the milk down. By Mr. Wilkerson: Q. After you had—when you went down to the house to take the milk to the children, what did you do there, if anything? A. Well, I warmed by the fire. Mr. Brown: We object to that as incompetent, irrelevant, and immaterial. The Court: Overruled. By Mr. Wilkerson: Q. And then, what did you do? A. Well, after I warmed awhile, I come on back home to my father's house. Q. What did you do when you got there? A. Well, I 'et' supper. Q. Did you eat with the rest of the members

of the family? A. No, the rest of them had done 'et.' Q. And what time of the night was it then? A. Well, I judge it was nine o'clock, but I don't know the exact time. Q. After you ate supper, what did you do? A. I went to bed. Q. With whom did you sleep? A. I slept with Sam Taylor. Q. I will get you to tell the jury, if you will, the position of the beds in the room—I believe they were both in the same room? A. Yes, sir. Q. Where were the beds in the room? A. Well, one of them was on the north side of the room, and the other one on the south end. Q. Which one did you sleep in? A. I slept in the one that was on the south end of the building. Q. Which of you went to bed first, you or Sam Taylor? A. Sam Taylor. Q. And what was the position you occupied in the bed with reference to whether or not you slept in front or behind. A. I slept behind. Q. Did you leave that bed that night? A. No, sir. Q. What time would you say it was when you went off to bed and went to sleep? A. Well, I judge it was around about 9 before I went to sleep. I talked a little while after I went to bed, Sam and I. Q. Now, do you own an automobile? A. Yes, sir. Q. Was your automobile there at home that night? A. Yes, sir. Q. How many of them were there at your home? A. Well, there was Sam Taylor, myself and my father. Q. How many automobiles? A. Oh, just —only the one. Q. What kind of an automobile was that? Mr. Brown: If your Honor please, we object to that as incompetent, irrelevant, and immaterial. The Court: Overruled. Mr. Brown: Exception. A. A 1928 Chevrolet. By Mr. Wilkerson: Q. What was its condition with reference to being fit to run? A. Well, the rubber was bad on it, and the lights wasn't no good. Q. Did you use your automobile in going to Jay for the trial? A. No, sir. Q. Why didn't you use it? A. The casings was too bad to. Q. How long had you known Mr. Creech? A. Oh, I have known him for, I guess four or five years, something like that. Q. Have you talked to Mr. Creech since this thing happened? A. Yes, sir. Q. Where was that? A. It was at Salina. Q. Where in Salina? A. Well, at Salina, a little old hamburger joint they have got in town

—south side of the street, Salina. Q. What was said in that conversation? A. Well, he called me off and told me that he wanted to make a settlement with me, and we walked down around that building, and he told me if I would give him $50 and the $35 that he owed me, he wouldn't appear over here at the day of the trial. Q. And what did you say? A. I told him I wouldn't do it. Q. Was anybody present at the time he called you off? A. Yes, sir. Q. Who was that? A. Lee Miller. Mr. Wilkerson: I believe you may cross-examine him."

Lee Miller, a witness for the defendant, testified he heard the prosecuting witness say to the defendant at Salina that he would like to make a settlement with him, and that they walked around the building, and he heard the defendant say to him, "I can't do that."

On rebuttal the prosecuting witness, Hugh Creech, was recalled and testified that he did not make the statements attributed to him by the defendant and by the witnesses J. O. Turner, Bud Gann and Martey Phelan. Two witnesses, Charlie Tuttle and Charles Brashiers, testified to the good reputation of the prosecuting witness, Hugh Creech, as to truth and veracity.

We have set out very fully the evidence in this case. It is contended by the defendant:

"First. That the evidence adduced at the trial of said cause was insufficient to support a verdict of 'guilty.'

"Second. That the defendant did not have a fair trial."

These alleged errors may be considered together.

During the trial of this case the record reveals that on practically every ruling by the court on the admission or rejection of evidence an exception was taken by the special prosecuting attorney to the ruling of the trial judge in the presence of the jury. When the prosecuting witness was on the stand and being cross-examined, he

was asked by counsel for defendant if he had not had a conversation with J. O. Turner and his daughter, Dorothy Bryan, at a certain place on the day after the robbery, and if he had not made statements to them with reference to the kind of cloth the parties were wearing at the time of the robbery. This question was asked, as stated by counsel, for the purpose of laying a predicate for impeachment of the witness and for this purpose was properly asked. Counsel who was acting as special prosecutor for the state objected strenuously to these questions, and these questions and answers cover several pages of the record which was in the presence of the jury. And when the court permitted any question to be asked, counsel for the state always took an exception to the ruling of the court in the presence of the jury. The taking of these exceptions by counsel representing the state could not serve the state for any purpose if the defendant was acquitted, and an examination of them reveals that the exception could only have been taken for the purpose of prejudicing the defendant and an attempt to cause the jury to believe that the trial court was in error in admitting this evidence.

When the witness J. O. Turner was produced as a witness and counsel for defendant propounded to him the same questions which were asked Hugh Creech in laying a predicate for impeachment, counsel for the state objected for the reason that it was not proper, and the trial court sustained the objections thereto, and defendant excepted. This was a proper question and was in proper form. The court, however, did permit the witness to testify as to the conversation he heard from the prosecuting witness.

While the defendant was upon the witness stand, counsel for the state questioned the defendant as to his

being in the town of Jay on the day of the robbery, April 11, 1939, attending court and asked him if Charlie Schroggins was not present with him as one of his witnesses and further asked him if he didn't have a conversation with the said Charlie Schroggins. The record reveals the following with reference to this:

"Q. Do you remember a conversation you had with him out on the north side of the courthouse over there at Jay? A. I remember talking to Charlie. Q. Will you tell the Court and jury what that conversation was? Mr. Wilkerson: We object to that for the reason that it doesn't appear that the conversation would be competent, relevant or material. Mr. Brown: It will be developed, your Honor, please. The Court: Well, you might state what it was about. By Mr. Brown: Q. Relative to this case? Mr. Wilkerson: We object to it, for the reason that it is too indefinite and uncertain. This case was not at that time pending. Mr. Brown: Let him tell it. Mr. Wilkerson: We object to it for the reason of the indefiniteness of the question. The Court: (To the Reporter) Read the question. (At this time said question is duly read to the court by the reporter.) The Court: What time do you mean? Mr. Brown: The day before it happened that night. The Court: Overruled. Mr. Wilkerson: We except, and if the Court please, I would like to make a record on this. The Court: All right. Overruled at this time. Mr. Wilkerson: We except. By Mr. Brown: Q. Now, did he talk to you relative to this case? A. Well, I don't know whether you would call it relative to this case or not, but he talked to me. Q. Tell what was said. Mr. Wilkerson: We object to that. The Court: Well, sustained. By Mr. Brown: Q. I will ask you if you and Charlie Schroggins on the 11th day of April, 1939, at the courthouse in Jay, and just on the north side of the courthouse, didn't have a conversation relative to the hijacking of Mr. Creech? Mr. Wilkerson: We object to that for the reason it is too indefinite, calls for a conclusion of the witness, and is not the way to impeach the witness, and ask that it be stricken from

the jury, and the jury admonished not to consider it. The Court: Sustained in that form. You may ask him if he didn't say such and such a thing and such a place to some particular person. By Mr. Brown: Q. Now, did you and Charlie Schroggins have a conversation on the north side of the courthouse at Jay on the 11th day of April, 1939, with relation to the hijacking of Mr. Creech? Mr. Wilkerson: We object to that, if the court please, and ask the court to admonish the prosecutor not to repeat that question, for the reason the court has sustained an objection to it. The Court: Sustained in that form. Mr. Wilkerson: And we will ask the court to admonish the jury not to consider that. The Court: Well, of course, any question to which the court has sustained an objection, the jury will disregard the question. Mr. Brown: It just occurs to me— (At this time Court and counsel confer out of the hearing of the jury and the court reporter.) Mr. Brown: (At the conclusion of said conference) That's all. Mr. Wilkerson: (to the witness) Come down. Witness excused."

We think this question was competent and that the trial court should have permitted it to be answered. If the defendant on that date had had such a conversation with the said Charlie Schroggins, the said Charlie Schroggins would have been permitted to testify to this conversation either as direct or rebuttal testimony if the proper predicate had been laid therefor, but the record reveals that after this question was propounded by counsel representing the state in the presence of the jury, the state made no effort and did not call the witness Charlie Schroggins and offer him as a witness in this case. The asking of this question in the presence of the jury and the failure to call the witness was certainly highly prejudicial and unfair to the rights of the defendant and under the facts in this case was without doubt the leading factor in causing the jury to return a verdict of guilty against this defendant.

Another ground relied upon by defendant, that he did not have a fair trial in this case, is set up in his motion for new trial. The fourth paragraph is as follows:

"4. One of the jurors to whom the said cause was tried, namely Herbert Bates, was disqualified in fact to sit as a juror in said cause, because of the bias and prejudice which he, the said Herbert Bates had and held against this defendant and against the near relatives of this defendant, with which said relatives this defendant was closely associated, and near whom this defendant had lived during the whole of his life; that the feeling of enmity and hatred which the said Herbert Bates entertained toward this defendant was deepseated and of long standing, but this fact was not known to the defendant at the time the jury for the trial of said cause was being qualified and the said fact was not known to the defendant's attorney.

"The defendant states the facts to be that some eight years prior to the time of the trial, the said Herbert Bates had an altercation or personal difficulty with one of the near relatives of this defendant; that thereafter, and since the said altercation, the said Herbert Bates, has entertained an ill will and the feeling of hatred toward this defendant as well as all of the other members of the Goings' family; that he, the said Herbert Bates has failed and refused to speak to or be neighborly with any of the relatives of this defendant.

"Defendant states that said altercation was, as he understands, of a minor nature, and the fact that the said Herbert Bates has, through the years, entertained the feeling of ill will and refused to speak for such a long period of time to the relatives of the boy with whom he, the said Herbert Bates, had the difficulty, clearly shows that the said Herbert Bates is a man who entertains a feeling of ill will for a long period of time, and one who would be unable to cast aside personal feelings as a juror in said cause; that this defendant avers that the said Herbert Bates took the said feeling of ill will

toward him and his family into the jury box; that by reason thereof he, the said Herbert Bates, did express himself in a manner that influenced the jury in making up its verdict, and this defendant verily believes that by reason of said feeling on the part of him, the said Herbert Bates, the verdict of the jury was changed, and that if the said juror had been of an unbiased and unprejudiced mind, a different verdict would have been returned by said jury.

"The defendant therefore avers and alleges that he did not have a fair trial; that he was not tried by an unbiased and unprejudiced jury as the law contemplates.

"The defendant is attaching hereto and making a part hereof the affidavits of W. F. Goings, Jake J. Muskrat and Mary E. Goings to substantiate defendant's allegations of bias and prejudice on the part of the said juror, Herbert Bates."

Attached to the motion were three affidavits made by W. F. Goings, Mary E. Goings, and Jake J. Muskrat. In the affidavit of W. F. Goings, who was an uncle of defendant, it is stated that he was acquainted with one Herbert Bates who was a juror in this case. They had at one time been close friends and had visited together and had known him for a period of twenty-five years. That about eight years prior to the trial the said Herbert Bates and the son of affiant, Brewster Goings, had had a difficulty and that the said Herbert Bates had become so bitter against him and his family that he had not spoken to him since that time, although he had been with him and near him on many occasions. That the said Herbert Bates operated a mill and that he sent certain members of his family, to wit, his wife and son, to have some corn ground into meal, and that said Herbert Bates had refused to grind the corn, saying that he did not want the business of this affiant and his family. He also stated

he was not present at this trial and did not know the said Herbert Bates was a prospective juror in this case.

The affidavit of Mary E. Goings, his wife, corroborated the affidavit of her husband with reference to she and her son taking the corn to his mill and his refusal to grind the same. The further stated that Herbert Bates after the difficulty with her son had ignored her and refused to speak to her when she met him.

The affidavit of Jake J. Muskrat states that for a long time he has been personally acquainted with the Goings family and Herbert Bates. That he is not unfriendly to any of the parties. That since the difficulty between Herbert Bates and Brewster Goings, the said Herbert Bates had been unfriendly to the Goings family, and upon one occasion Herbert Bates said to him he "hated everybody by the name of Goings, and had no use for anybody by the Goings name."

As above stated, we have carefully reviewed and quoted from the evidence in this case. We are well aware of the many decisions of this court that where there is evidence in the record from which the jury could legitimately conclude that defendant was guilty of the crime charged a conviction will not be set aside because of the alleged insufficiency of the evidence, and that where there is a conflict in the evidence, and this has been passed upon by the jury, the verdict will not be set aside. The true rule has been ably expressed in a case before the territorial court of Meierholtz v. State, 14 Okla. 359, 78 P. 90, 91, in an opinion by Judge Burford, where it is stated:

"While this court will and does examine the evidence in every case where it is argued that the evidence is insufficient to support the verdict, yet it is rare that we find a case where such examination would be required if counsel for the complaining party would bear in mind,

when preparing the case for the court, and apply the rule, that the appellate court will not weigh conflicting and contradictory evidence which has been passed upon by the jury and trial court, but will only interfere where there is an entire absence of testimony upon some material issue, or that the evidence so clearly preponderates in favor of the defendant as to suggest the possibility that the verdict was the result of misapprehension or partiality."

It is unnecessary to cite further cases upholding this doctrine, and if this was the only error relied upon we would not hestitate to apply those rules to the instant case. It is hard to read the record and see how the jury came to the conclusion of defendant's guilt. It is certainly what one would consider a close case and one in which some very small matter might cause the jury to come to a certain conclusion. We have above given several instances which undoubtedly were the ones which caused the jury to return a verdict of guilty, and if they were, the defendant did not have that fair and impartial trial to which he was entitled under the law. The only corroboration of the prosecuting witness, Hugh Creech, in his identification of defendant as one of the parties who robbed him as stated in the state's brief, was the testimony of the witness Martenus or Martey Phelan, when he testified defendant was not at the home of his father, Alex Goings, while he was there for 30 minutes near 8 o'clock p. m., on the night of the robbery, April 11, 1939. This contention, however, overlooks the fact that this same witness testified positively that when he was leaving the Goings home he heard a voice calling him which he recognized as the voice of the defendant, whom he had known for several years, and that he did not stop or return for the reason that he thought he would see the defendant at some future time. If this testimony is true, then the defendant could not have been at the

scene of the robbery, for this was just near the time it was being perpetrated, and it was a distance of three and one-half miles through the country or ten miles by the road. It will be further remembered that this evidence is corroborated not only by the defendant, but by his father, Alex Goings, his nephew, Donas Douglas, and by three disinterested witnesses, Sam Taylor, C a l v i n Owens, and Mary Owens, who saw him at this same time and at the very time the prosecuting witness said he was being robbed by defendant and his codefendant at his home.

Attention is also called to the fact that there is not a line of evidence in the record to connect this defendant with his codefendant, Huse DeArmond, either before or after the robbery. No part of the property taken in the robbery was found in his possession, notwithstanding the fact that he was arrested on the following morning at his father's home. No effort was made to compare his tracks with the ones found by the officers at the Hugh Creech home on the evening following the robbery, and the testimony of the officers was such as would lead one to believe that the tracks were not such as would fit his. No effort was made to see if there were any fingerprints on the guns which were handled by his codefendant, Huse DeArmond, according to the prosecuting witness. The fact that the parties who committed this robbery had handkerchiefs or cloths over their faces would have made their identification much more difficult, and the statements made by the prosecuting witness soon after the robbery that if he had known who robbed him he would kill them, all have a tendency to make this such a close case that the least irregularity might cause an unfair trial of this defendant. We think the answer to it is the question propounded to the defendant upon cross-examination by the special prosecuting attor-

ney when he asked: "Q. I will ask you if you and Charlie Schroggins on the 11th day of April, 1939, in the courthouse on the north side of the courthouse, didn't have a conversation relative to the hijacking of Mr. Creech?" This question was repeated the second time in the presence of the jury. To our mind, under the facts in this case, and taking into consideration the fact that no effort was made by the state to bring the witness Charlie Schroggins before the jury to testify with reference to this conversation, it was highly damaging and prejudicial to the defendant and within itself demands that a new trial be given in this case.

In the case of Humphrey v. State, 8 Okla. Cr. 449, 128 P. 742, 743, this court said:

"When the issues are sharply drawn and the facts are sufficient to justify an acquittal or to sustain a conviction, such erroneous instructions cannot be held harmless. In the interest of justice we do not feel that this conviction should be affirmed. In the trial of criminal cases substantial justice is the end to be obtained, and it is essential that a fair and impartial trial be had and that the instructions of the court be free from errors such as are reasonably calculated to prejudice the substantial rights of the accused."

In the case of Minyard v. State, 57 Okla. Cr. 332, 48 P. 2d 864, 869, it was said:

"While it is an established rule of this court that verdicts which receive the approval of the trial judge will not be disturbed when supported by evidence sufficient to make out the offense charged, however, when the evidence is all carefully considered, and it appears that it is wholly wanting in respect to some essential element of the offense charged, it is not only the province, but the duty, of this court to reverse the judgment.

"No man ought to be convicted of a crime upon mere suspicion, or because he may have had an opportunity to commit it, or even because of bad character, and where

circumstances are relied on for a conviction, they ought to be of such a character as to negative every reasonable hypothesis except that of the defendant's guilt.

"When we recall the presumption that the law always indulges as to the innocence of the defendant, and the necessity of establishing his guilt beyond a reasonable doubt, we think it would have been a proper exercise of the power vested in the trial court to have advised the acquittal of the defendant on the ground that the evidence was insufficient to warrant a conviction."

We also wish to refer to the motion for new trial filed in this case which has reference to the juror Herbert Bates. Under the authorities and under ordinary circumstances, this error would not be considered sufficient for the reversal of this case, and if it was the only one relied upon we would not reverse the case by reason of the action of the trial court in overruling the same. But at the time it was presented, the court had before it the whole picture of this case as we have heretofore outlined. It was obvious that something had caused this jury to return a verdict of guilty against this defendant. The court was also aware, as shown by the record, that the codefendant, Huse DeArmond, had been tried immediately following this and in the court over which he was presiding, and that a jury had returned a verdict of not guilty in his case. While we can see how this might happen and under the law would not entitle the defendant to a new trial, yet under the circumstances as shown by this record it occurs to us that the court should have granted the defendant a new trial in this case, and we are now firmly of the opinion that this should be done, and if the county attorney of Mayes county is of the opinion that he has sufficient facts which justify it, he may again try this defendant.

186

We think that the ends of justice demand it, and it is therefore ordered that the judgment and sentence of ten years in the penitentiary be set aside and that the same be reversed to the district court of Mayes county for such action as the law and the facts demand.

JONES and DOYLE, JJ., concur.