BILL PERRY v. STATE.

No. A-9972.    April 15, 1942.

(125 P. 2d 219.)

Smith & Walker, of Miami, for defendant.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and N. C. Barry, Co. Atty., of Miami, for the State.

BAREFOOT, P. J. Defendant, Bill Perry, was charged in Ottawa county with the crime of burglary in the second degree, was tried, convicted, and sentenced by the court to serve a term of three years in the penitentiary, and has appealed.

Counsel for defendant in his brief says:

"While there are several assignments of error presented to this court by the petition in error herein filed * * * we ask this court to review the case upon one point alone * * *", viz., "It is our position that this cause should be reversed at the hands of this court for lack of evidence and if no further evidence can be offered, by the state, at a later date, it should be, by the court then having jurisdiction, ordered dismissed."

The information jointly charged the defendant and Ernest Jackson with the crime of burglary in the second degree. A codefendant, Claude Murphy, who was charged jointly in the preliminary complaint, entered his plea of guilty and was sentenced to serve a term of two years in the state reformatory at Granite.

This charge grew out of the burglarizing of the residence of M. A. Miller and his wife, Gertrude Miller, in Ottawa county on Sunday, December 11, 1938, at which time numerous articles of clothing, household goods, bed-

ding, and groceries were stolen. The evidence revealed that Mr. and Mrs. Miller left their country home between 12 and 12:30 p. m. on December 11, 1938, for the purpose of visiting relatives and friends in the city of Picher, which was located near their home. That all the doors were securely locked and fastened when they left. That when they returned between 4 and 5 p. m. on the same date, their home had been broken into and much property had been taken, including men's, women's, and children's clothing, and bedding and a certain box of groceries which they had purchased the preceding Saturday. The door had been unlocked but had been partly closed by Mrs. Miller's mother, Mrs. Grandon, who had preceded her daughter to her home. On the following Tuesday a search warrant was procured, and the residence of the defendant, Bill Perry, together with the residence of Claude Murphy, who both lived in the town of Picher, was searched by officers, and both Mr. and Mrs. Miller were present and identified much of their clothing, bed clothing, and other articles which were found at these residences and most of which was found at the residence of the defendant, Bill Perry. There were certain groceries there which they could not positively identify, but resembled the ones which they had purchased. The defendant, Bill Perry, was not present at the time the search was made and was not arrested until some nine months after the commission of this crime, having left the country a few days after the search and having lived in New Mexico and other places during the interval.

In contending that the evidence is insufficient, it is claimed that the evidence shows that Ernest Jackson is an accomplice and that his evidence is not corroborated in the manner required by the law of this state and that the same is therefore insufficient.

It is the contention of the state that this witness was not an accomplice under the evidence and, further, that if he was an accomplice, the evidence is amply sufficient to properly corroborate his testimony.

The court in charging the jury submitted this issue as a question of fact as to whether the witness Ernest Jackson was an accomplice and properly instructed the jury that if they believed he was an accomplice his testimony should be corroborated.

The evidence of the witness Ernest Jackson was that he had been keeping company with defendant's daughter, and that on Sunday morning, December 11, 1938, the defendant, in company with Claude Murphy, came to his home in Picher about 9 o'clock and wanted him to go driving with them in his new car, and that they drove out to Claude Williams' sawmill, which was about ten miles and across the Missouri and Oklahoma state line. Defendant desired to see Dolty McDonald, who was working there. They arrived about 12 o'clock and left a little after 1 o'clock p. m. That while driving along the road defendant passed a house and said "it was no good." That in a few moments they passed the Miller home and he said that was a "good one." That he stopped the car and both the defendant and Claude Murphy got out and went into the Miller home and in a few minutes returned with a bundle of clothing wrapped in a sheet, groceries, etc., and put them in the car. That they tried to get him to participate in the burglary, but that he refused to do so and refused to open the door of the car so they could place them therein when they returned. That the defendant drove back to Picher, arriving there about 2:30 p. m. That he got out of the car on the street and went to the show. That he went to the Perry home that night and that both defendant and Claude Murphy were there. He testified:

"Q. Was anything said between Perry and you and Murphy in regards to this stuff? A. Yes, sir, he wanted to get me to sell some of the shirts to my stepfather and I told him that I couldn't take anything like that up to my stepfather and sell it to him. Q. Did he say anything about where he got the shirts? A. No, sir, he knew I knowed. Q. Did you see any of the things? A. I seen a suit of clothes— Q. What kind and color? A. Blue serge. Q. Was any conversation had between you and Bill Perry with reference to that suit? A. Yes, he told me to try it on. Q. Did you do that? A. No, sir, I told him I didn't want to have anything to do with any of that stuff. Q. What did you do then? A. I stayed up there with Mrs. Perry and her boy was sick and I would help her and get medicine. I liked them on account of going with their daughter. Q. You say you went with a daughter? A. Yes, sir."

Mr. and Mrs. Art Grandon testified for the state that they were the mother and father of Mrs. M. A. Miller, and that on the Sunday in question they left their home for a drive, having with them their nine year old grandson, the child of Mr. and Mrs. Miller. They lived in close proximity to the Miller home. As they returned home about 4 o'clock p. m., they noticed the door of the Miller home being opened. Mrs. Grandon went in and found the house had been burglarized and the property above described missing. She closed the door and notified her daughter upon her return.

Mr. and Mrs. Claude Williams testified to the defendant, Ernest Jackson, and Claude Murphy coming to the sawmill and their home on Sunday morning, as testified by Ernest Jackson, and to their leaving between 12 and 1 o'clock p. m. They said it was about three-quarters of a mile from the sawmill to the home of Mr. and Mrs. Miller.

Albert Slaughter and Verl Cartwright were working and lived near the home of Mr. Williams who owned the sawmill. They both saw the defendant, Ernest Jackson, and Claude Murphy came to the sawmill and Williams' home on Sunday, December 11, 1938, and saw them there from 12 to 1 p. m., when they left.

The defendant, Bill Perry, corroborated the evidence of the witness Ernest Jackson as to the visit to the sawmill on Sunday morning. However, he testified that they did not enter the home of Mr. and Mrs. Miller and did not burglarize the same or take any property therefrom. That they returned to his home in Picher about 2 p. m. That he got out of the car and loaned the same to Claude Murphy, who drove away in company with the witness Ernest Jackson. That he stated he was going to Webb City to see someone about getting a job. That he accompanied his son-in-law, Wayne Cole, and daughter downtown to Picher about 2:30 p. m. Each of these witnesses corroborated his statement. He testified to seeing several parties down there, and these parties testified in his behalf as to seeing him on the streets of Picher on a Sunday afternoon. However, these witnesses were not clear as to the date, and one of them testified that it was after he heard of the burglary. This, of course, would have been impossible. The defendant further testified that he returned home about 5 p. m. and that his car was there and also a bundle of clothing and bed clothing, which his wife said had been left there by Claude Murphy.

His wife testified that Mr. Murphy brought the car home about 4 p. m. and brought into the house the clothing and bed clothing, being the same clothing that was afterwards found there by the officers and identified as the property of Mr. and Mrs. Miller. That he told her he was going to leave in a few days and she could use any of the property she desired. She also testified that

members of her family had removed the bundle and put the clothes up in the house, as she was sick and was attending to a sick baby.

Claude Murphy, who had just returned from the Granite Reformatory at the time of this trial where he had served a sentence of two years for his participation in this crime, testified corroborating the defendant's testimony, and stated that he had stolen the property from the Miller home and that the defendant did not participate therein. That he had brought the clothing there and had told Mrs. Perry to use the same, as he was moving away, that he did not need the property. As to the witness Ernest Jackson, he stated that he went with him in the car, but that he did not assist in the burglary and that he was asleep in the car at the time he committed the act. His testimony with reference to this was:

"Q. And while he was asleep you went in there and got this stuff yourself? A. I'm not sure he was asleep. Q. Well, he didn't know anything about it? A. Not to my knowledge. Q. And he never did know anything about it according to your knowledge? A. Yes, he woke up on the way back. Q. How did he find out what happened? A. I told him."

From the above statement it is very clear that there was a direct conflict in the evidence, and under the well established rule of this court we will not weigh conflicting and contradictory evidence which has been passed upon by the jury and the trial court, but will interfere only where there is an entire absence of testimony upon some material issue or that the evidence so clearly preponderates in favor of the defendant as to suggest the probability that the verdict was the result of misapprehension or partiality. See Vasco Goings v. State, 74 Okla. Cr. 161, 124 P. 2d 280.

It will also be noted from the above statement that the jury were given the right to pass upon the question as to whether the witness Ernest Jackson was an accomplice. There was ample evidence for the jury to find that this witness was not an accomplice. Not only did the evidence of Ernest Jackson show that he was not an accomplice, but the testimony of the witness Claude Murphy, who testified for the defendant, absolved Jackson from any guilty connection with the crime. He testified that Jackson was asleep in the car and did not know of his intentions, had no knowledge of the burglary until afterwards, and had no connection with the disposal of the stolen property.

Defendant's defense of an alibi was submitted to the jury. The time element is such that even the time stated by the defendant's own witness was such that he could have been guilty as testified to by the witness Jackson. Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289.

It is unnecessary to unduly lengthen this opinion by giving the evidence of each witness with reference to the alibi defense. It is clear that the evidence of the state is amply sufficient to sustain the verdict. The instructions of the court fully covered every phase of the law. There is nothing to indicate that the defendnat did not have a fair and impartial trial.

The judgment and sentence of the district court of Ottawa county is therefore affirmed.

JONES and DOYLE, JJ., concur.