[No. 20779. In Bank. — December 14, 1891.]

THE PEOPLE, RESPONDENT, *v.* CHARLES FREE-
MAN, APPELLANT.

92   359
110   121
92   359
114   430

92   359
116   201
92   359,
129   560:
92   359
130   455
130   685
92   359
143   606,
92   359
149   350

CRIMINAL LAW — HOMICIDE — CREDIBILITY OF PROSECUTING WITNESS — REA-
SONABLE DOUBT — PROVINCE OF JURY. — Although room may appear
to the court for grave doubts as to the truth of the testimony of a wit-
ness for the prosecution who testifies to a murder committed by the
accused, his credibility is a question for the jury, and it cannot be held
as matter of law that the jury was not warranted from his testimony in
concluding that the guilt of the defendant was established beyond a
reasonable doubt.

ID. — EVIDENCE — REBUTTAL OF DEFENDANT'S TESTIMONY — COUNTER-TES-
TIMONY FOR PROSECUTION IN CHIEF. — Where a defendant accused of
murder testified that, in a quarrel with a witness for the prosecution,
had previous to the death of the deceased on the same day, while cross-
ing a bridge, he had knocked the witness down on the bridge, and kicked
him several times, evidence that there was mud on the bridge, and that
there was no mud on the clothes of the witness when he told of the
homicide on the same day, is proper evidence in rebuttal; and the fact
that the witness, on his examination in chief, was asked whether he and
the defendant had any difficulty at the time testified to by the defendant
does not preclude the proof in rebuttal of any specific fact inconsistent
with the defendant's testimony afterwards given; nor is the state pre-
cluded from such rebuttal by the fact testified to for the prosecution in
chief, that the witness was bloody when he told of the homicide.

ID. — TRIAL — EXAMINATION OF TALESMAN — REVIEW UPON APPEAL — AC-
TION WITHOUT PREJUDICE. — The action of the trial court in sustaining
an objection by the prosecution to a question asked of a talesman during
his examination on *voir dire*, touching his qualifications to act as a juror,
will not be considered on appeal, where it appears that such action, if
error at all, was not prejudicial, for the reason that the talesman was
challenged peremptorily by the defendant, and did not sit on the jury,
and the court subsequently allowed the defendant another peremptory
challenge, in addition to the number allowed by law.

NEW TRIAL — NEWLY DISCOVERED EVIDENCE — SHOWING REQUIRED. — A
motion for a new trial upon the ground of newly discovered evidence is
looked upon with suspicion and disfavor, and a party who relies upon
that ground must make a strong case, both in respect to diligence on his
part in preparing for the new trial and as to the truth and materiality
of the newly discovered evidence, and that, too, by the best evidence
obtainable; and if he fails in either respect, his motion must be denied.

ID. — DILIGENCE — PREVIOUS KNOWLEDGE OF FACTS. — Where from the
nature of new evidence it must have been within the personal knowl-
edge of the moving party previous to the trial, an affidavit that he did
not known of it is unworthy of credence, and cannot render the evidence
a proper basis for a new trial.

ID. — MATERIALITY OF EVIDENCE. — If new evidence was within the reach
of the moving party before the trial, his ignorance of its materiality can-

not excuse his lack of diligence in securing and presenting it, and it can-not be made the basis of a new trial.

ID. — EVIDENCE OF NEW AND INCONSISTENT DEFENSE. — Although a defend-ant may make as many and different defenses to a charge as he may see fit, although they may be inconsistent, yet if he proceeds to trial upon a certain line of defense without making due inquiry and preparation as to any other defense that he may have to the charge, he cannot be per-mitted, when the issue has gone against him, to thereafter come in, and, upon a motion for a new trial, suggest for the first time that there is other evidence material to his defense, upon a new and different theory, in conflict with the defense made at the trial.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*C. N. Post,* for Appellant.

*Attorney-General Hart,* for Respondent.

BEATTY, C. J. — The defendant, who was convicted in the superior court of murder in the first degree, and sen-tenced to death, appeals from the judgment, and from an order denying his motion for a new trial.

Of the numerous assignments of error contained in the record, only four have been insisted upon by coun-sel in their oral and printed arguments, and to these we shall confine our attention.

A brief outline of the facts of the case will conduce to a clearer understanding of the questions to be decided: The defendant, Freeman, the deceased, Mark Feeny, and two other men, Terrill and Wilks, were employed on a ranch by one De Kay, — Feeny as cook, the others as laborers. These men occupied a small house on a ranch four miles distant from the home ranch of their em-ployer. A day or two prior to March 6, 1890, Terrill went to the home ranch, leaving only Freeman and Wilks at the other place. The weather at this time was too rainy to admit of plowing (the work in which Terrill, Freeman, and Wilks had been engaged), and having no work to do on the afternoon of March 6th, Freeman and

Wilks took their shotguns and went hunting, leaving Feeny alone on the ranch.

The testimony shows that Feeny was a small man, only about five feet high, and weighing less than a hundred pounds; that he was sick, consumptive, weak, and emaciated. There had been some complaint on the part of the hands as to his inefficiency as a cook, but it does not appear that there had been any quarrel or disagreement between him and Freeman during the five or six weeks he had been on the ranch. About ten o'clock at night on the 6th of March, Freeman and Wilks returned to the ranch after their hunt. They had stopped on their way at Antelope, and at a wayside saloon had taken several drinks, but, according to the testimony of each, both were sober enough to know and to remember all the details of what ensued. As to what then occurred, this is the story told by Wilks on the witness-stand: He says that he entered the house first, put aside his unloaded gun, and heard Feeny call out from his bed, to which he had retired, saying, in substance: "You will find your suppers set out on the table"; that he proceeded to the kitchen, and while he was feeling for the lamp and a match, he heard Freeman, who had in the mean time entered the common sleeping-room, where Feeny was lying in his bunk, calling him to come in there. He went to the bedroom in response to Freeman's call, who announced that he intended to kill the cook, and that he, Wilks, must help him. Wilks told Freeman that he must be joking; that he did not mean it; but Freeman insisted that he did mean it, and that unless Wilks helped him, he would kill him too. Thereupon Wilks says he attempted to leave the room, but was knocked down by a blow from Freeman's gun; that while he was down, Freeman cocked both barrels of the gun and placed it against his breast; that he caught the gun and pushed it aside, when Freeman again knocked him down, across Feeny's bed, with a blow of his fist, and, leaning over, bit through his ear. During this struggle, Feeny was entreating Freeman not to kill "Archie" (Archie

Wilks), but Freeman continued his violence until, in answer to his demands, Wilks finally said he supposed he would have to help him kill Feeny, whereupon he was released by Freeman and allowed to get up. Freeman then ordered Feeny to get up, adding that "his time had come." Feeny sat up in bed, and Freeman, still holding his loaded gun in his left hand so as to threaten Wilks, passed his right arm around the body of Feeny under his arms, and lifted him from his bed; then, carrying his gun in his hand and Feeny under his right arm, and commanding Wilks to follow, he passed out of the bedroom and from the house, proceeded to a water-barrel, containing the water used for domestic purposes, and, bending Feeny across his right leg with his right arm, stuck his head down into the water-barrel and held him there until he was drowned, Wilks in the mean time standing by, too terrified to interfere or to expostulate. When Feeny, after being held in the water for three or four minutes, was quite dead, Freeman left him, with his feet resting on the ground and his head in the water, and ordered Wilks to get on a horse, go to the home ranch, and inform Mr. De Kay that on their return from Antelope they had found the cook drowned in the water-barrel. Wilks went as directed, but instead of telling the story put in his mouth by Freeman, told De Kay the truth as to the murder.

Freeman, testifying on his own behalf, told an entirely different story. He says that when he and Wilks were on the road from Antelope, coming back to the ranch, they got into a quarrel over his proposition to ford a creek, instead of going round to a bridge; that the quarrel continued as they walked along, and at the bridge culminated in a fight, in which Wilks first struck him with his gun, whereupon he knocked Wilks down on the bridge with his gun, and kicked him several times, until he promised to behave himself. They then proceeded to their house, Wilks entering in advance and going into the bedroom. They called Feeny, but got no answer, and after a while started to the stable to feed and

care for their horses. On their way, Wilks went to the water-barrel to get a drink, and from there called out to Freeman, saying: " Here is ' Shorty ' " (the nickname of the cook). Freeman went to the water-barrel, and there saw Feeny's dead body in exactly the position and condition in which it remained until removed by the coroner the next day; that is to say (and as to this all the testimony agrees), the feet rested on the ground, he had his shoes as well as his pants on, his head was immersed in the water, which stood about eight or ten inches below the top of the barrel, and the lower part of his abdomen rested on the edge of the barrel.

When Wilks went to De Kay's to tell his story, Freeman walked over to their nearest neighbor and told his story. When he told how they had found the cook drowned in the water-barrel, he asked for a drink of whisky, saying he felt nervous, and got his neighbor to go home with him to keep him company. He proposed to bring the body into the house and lay it out, but being informed that it would be wrong to move it before the arrival of the coroner, took a blanket and covered it where it was.

Each of these conflicting stories is to some extent corroborated, and to some extent contradicted, by circumstances. The story of Wilks is opposed to the fact that there is a total absence of any apparent motive on the part of Freeman for wishing to injure Feeny, to the apparent difficulty that even a strong man would have experienced in drowning another, however small and weak, in the manner described, — the murderer having the use of only one arm, the other being occupied with the gun with which he was constantly threatening Wilks, and the victim's arms and hands being entirely free to grasp the edge of the barrel into which his head must have been thrust for a foot or more, in order to immerse it, — to the improbability that Feeny, who is represented as earnestly beseeching Freeman not to kill Archie, would have allowed himself to be carried to the water-barrel and drowned, not only without a struggle, but even

without a word of entreaty. Then there is the extremely significant fact that Feeny undoubtedly had his shoes on when he was drowned, and consequently, if Wilks's story is true, must have gone to bed with his shoes on. Wilks testifies that Feeny habitually slept in his pants, but neither he nor Terrill says that he ever went to bed with his shoes on.

It is claimed as a corroboration of Wilks's story that fresh blood was found in the bedroom, where, he says, the fight occurred; but, on the other hand, it seems to be claimed that this blood is accounted for by the supposition that Wilks, though wounded at the bridge, might have continued to bleed after his arrival at home.

Freeman's story is opposed to the fact testified to by several witnesses, that the bridge upon which he says he knocked Wilks down was covered with mud, and that no mud was observed on Wilks's clothes when he arrived at the home ranch. As against the conclusiveness of this circumstance, there was some testimony that the bridge was not, ordinarily, very muddy, except near the ends, and that there had been heavy rains, by which it was washed comparatively clean. It is also argued that any mud that may have been on Wilks's clothes would have been washed off by the rain while he was going from the bridge to the house, and from there to the home ranch. In corroboration of Freeman's story, and of the theory of the defense (viz., that Feeny, going for a bucket of water, and leaning over the barrel to lift it out, had fallen in a fit and drowned while unconscious), it was proved that a short time before he went to De Kay's ranch, and while working at another place, he had fallen in a fit and remained unconscious for some minutes. And it was proved that when his body was lifted from the barrel, the water-bucket was found under him in the water. There was, of course, a great deal of testimony as to minor details and collateral circumstances, but the foregoing statement exhibits the salient features of the case for the prosecution and the defense, and is sufficient to illustrate the points to be decided.

1. As to the contention that the verdict is not supported by the evidence, we can only say, that while the case as presented upon the record before us leaves room for grave doubts as to the truth of the story told by Wilks, it cannot be held as matter of law that the jury, who not only heard all the minute details of the evidence, but had the great advantage of observing the demeanor of the witnesses on the stand, was not warranted in concluding that the guilt of the defendant was established beyond a reasonable doubt. If Wilks told the truth, there can be no question that a cruel and deliberate murder was committed, and it was for the jury, in view of all the evidence in the case, to decide the question of his credibility. With their conclusion on this point we cannot interfere.

2. It is contended that the superior court erred in admitting, by way of rebuttal of Freeman's testimony, evidence of the mud on the bridge, and of the absence of mud from Wilks's clothes when he arrived at the home ranch. The claim of counsel is, that this was part of the prosecution's case, or if not, that it was made so by a question asked Wilks by the district attorney, on his examination in chief, as to whether he and Freeman had any difficulty on their way home from Antelope on March 6th. We think this evidence was clearly proper evidence in rebuttal, and we do not think that the general question asked Wilks on his direct examination precluded the proof of any specific fact inconsistent with the defendant's testimony as afterwards given. Still less was the state precluded from introducing such proof by the fact that Terrill had testified in chief that Wilks was very bloody when he arrived at the home ranch.

3. It is contended that the superior court erred in sustaining the objection of the district attorney, to a question asked of a talesman named Baker, during his examination on *voir dire*, touching his qualifications to act as a juror. It is unnecessary, however, to decide the question presented by this assignment of error, for the reason that Baker was challenged peremptorily by the

defendant, and did not sit on the jury, and the peremptory challenge so used was not lost to the defendant, because the court subsequently allowed him, upon the suggestion of the district attorney, to make another peremptory challenge, in addition to the number allowed by law. The final result, in other words, was the same as if the court had not only allowed the questions asked of the talesman, but had sustained a challenge for cause. Consequently, if there was any error, there was no injury in these rulings.

4. One of the grounds of defendant's motion for a new trial was newly discovered evidence. The motion upon this ground was supported by a number of affidavits of himself, his mother, his sister, and others, tending to show that his grandfather and other members of his family had been affected with insanity, and that he himself, since the age of nineteen years, had been subject to fits, rush of blood to the head, severe pains in the head; that when so troubled he becomes unable to control his actions or to remember anything he does; that when under the influence of liquor he becomes a dangerous man, crazy, and irresponsible, etc.

The learned judge of the superior court, in denying the motion for a new trial, delivered an opinion, from which we extract the following statement of his reasons for disallowing the claim based upon newly discovered evidence: —

"Admitting the materiality of this evidence, if produced at the defendant's trial, the first question that arises is, whether there appears from the affidavits such a showing as would enable this court to say that a case has been made out which should entitle the defendant to a new trial herein.

"A motion for a new trial upon the ground of newly discovered evidence has always been regarded by the courts with a great deal of suspicion and disfavor.

"It has been said that 'the temptations are so strong to make a favorable showing after a defeat in an angry and bitter controversy, and the circumstance that tho

testimony had just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence.'

"In one case it was said by Justice Sanderson, that 'applications for new trials upon the ground of newly discovered evidence must be looked upon with suspicion and disfavor, because the temptation to make a favorable showing after having sustained a defeat is great. A party who relies upon that ground must make a strong case, both in respect to diligence on his part in preparing for the new trial, and as to the truth and materiality of the newly discovered evidence, and that, too, by the best evidence that can be obtained. If he fails in either respect, his motion must be denied.'

" The law requires at the hands of the defendant that he make careful and diligent preparation for his trial; and it is to be presumed, more especially in a case of the importance of this, involving the life and liberty of the defendant, that in preparing for a trial, he should go over very carefully and diligently with his attorney every fact and circumstance which might in any way bear upon his defense.

" Looking at the character of the showing made by these affidavits, it is inconceivable, to my mind, that these facts, which are now relied upon as newly discovered evidence, should not have been known to the defendant, and called to the attention of the attorney in making preparation for the defense.

" It is true that the defendant states that many of the facts set forth in his affidavit were unknown to him until after his trial; but this statement becomes absolutely unworthy of credence, in view of the fact that in large part the contents of his affidavit are facts which must have been within his personal knowledge.

" It is not to be believed that the defendant could have suffered, as stated in his affidavit, at various times during his life, from fits and trouble, and pains in his head, and the loss of memory as to material things occurring during his life, and not have a personal knowledge of

the fact. Neither is it to be credited that a party who has been addicted to the use of strong drink can be entirely unaware as to the effect upon his physical and mental being in the use of intoxicating liquor.

"The defendant shows by his own statements, and it appeared in evidence at the trial of this case, that he had been drinking considerably on the day on which deceased met his death. The calling of that fact to the attention of his counsel, to my mind, should necessarily have led to an investigation by the attorney, which would have resulted in eliciting all the facts which are now relied upon by the defendant as newly discovered evidence.

"Furthermore, it appears by the affidavits of the mother and the sister of the defendant that all the material facts which are now relied upon by the defendant as newly discovered evidence were known to them before the occurrence of the facts out of which this case arose.

"And it appears from the counter-affidavits filed by the district attorney that this sister and the mother of the defendant were in daily communication with the defendant from the time of his arrest up to the time of his trial, and that throughout the entire nine days' trial, which resulted in the defendant's conviction, they sat beside him in the court-room, and consulted and advised, not only with the defendant, but with his attorney.

"The sister states in her affidavit that she saw the defendant on the afternoon of the day in question, about two o'clock, and that he was then under the influence of liquor, and knowing, as she did, the tendency of his mind and disposition when in liquor, it is almost incredible to believe that she should have neglected to inform his counsel of that fact while preparation was being made for his defense. And I am bound to assume, taking all the circumstances into consideration, that the attorney of the defendant, by an exercise of reasonable care, and inquiry of the defendant and those so intimately connected with him, could have ascertained all the facts in time to employ them in the defendant's behalf at the trial. Nor

can the defendant be excused or relieved in any way from the fact that he may have been ignorant of the law or of the rules of evidence which would make these facts material.

"A party is bound to know the materiality of his evidence, and ignorance of the law does not excuse. Whether or not he was sufficiently acquainted with the law to know of their materiality, it was his duty to have communicated them to his counsel.

"After a careful consideration of the showing made by these affidavits, when viewed in connection with the facts and circumstances appearing at the trial, I am entirely unable to come to the conclusion either that the evidence set forth was newly discovered, or that it could not by reasonable diligence have been produced at the trial.

"But there is another reason why the application of the defendant for a new trial upon these grounds would have to be denied.

"The showing made by the affidavits presented here is wholly and entirely in conflict with the defense made at the trial and the defendant's own evidence.

"While the defendant may make as many and different defenses to a charge as he may see fit, although they may be inconsistent, nevertheless, if he proceeds to trial upon a certain line of defense without making due inquiry and preparation as to any other defense that he may have to the charge, he cannot be permitted, when the issue has gone against him, to thereafter come in, and, upon a motion for a new trial, suggest for the first time that there is other evidence material to his defense upon a new and different theory.

"He cannot divide up his defense piecemeal. If he were to be permitted to pursue one line of defense without inquiring as to any other until the issue had gone against him upon that, and then for the first time inquire as to any other, and be granted a new trial upon the ground that it was newly discovered, there would be no end of litigation.

XCII. CAL.—24

"A new trial will not be granted upon evidence in conflict with that given at the trial. (*People* v. *McCauley*, 45 Cal. 146–148; *People* v. *O'Neal*, 67 Cal. 378.)"

These reasons, we think, are conclusive against the contention of appellant.

The record discloses no error, and the judgment and order of the superior court are therefore affirmed.

McFARLAND, J., GAROUTTE, J., SHARPSTEIN, J., PATERSON, J., HARRISON, J., and DE HAVEN, J., concurred.

Rehearing denied.