# JACK PLAXICO v. STATE.

No. A-10282.    April 19, 1944.

(148 P. 2d 201.)

354

Lewis Hunter and J. F. Thomas, both of Lawton, for plaintiff in error.

Randell S. Cobb, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, P. J. The defendant, Jack Plaxico, was charged by information filed in the district court of Comanche county with the crime of larceny of livestock; was tried, convicted and sentenced to serve three years in the State Penitentiary, and has appealed.

For a reversal of this case, it is contended that there is not sufficient evidence to corroborate the testimony of the accomplices and that, therefore, the evidence is wholly insufficient to sustain the judgment of conviction.

The theory of the prosecution was that the defendant had made an agreement with two youths, Ray Seay, age 17, and Ode Risinger, age 18, whereby the two youths were to put up some cattle belonging to L. A. Goodwin, but which were being looked after by Ray Seay, and that pursuant to such agreement three white-faced calves of Goodwin's were placed in a barn where they were loaded into the pickup truck of the defendant and transported by defendant to a public sale at Frederick where they were sold in defendant's name. The defendant gave the two youths a check in the sum of $20 as their part in the transaction.

L. A. Goodwin testified that he lived at Altus. That he had some cattle in Comanche county near the town of Cache. That Ed Seay and his son, Ray Seay, were looking after this livestock for him.

Ed Seay testified that he had been working for Mr. Goodwin near Cache since 1933. That Goodwin had some cattle on two different places. That he was farming and

seeing after the cattle on one place, and that his son was living on the other place. That at the place where the son, Ray Seay, lived there were 15 cows and nine calves. That on the night of February 11, 1941, two white-faced heifers and one white-faced bull calf were taken from the herd of cattle at the Ray Seay place. That he gave no one permission to take those calves.

Ode Risinger testified that he lived one-half mile west of Cache and was well-acquainted with defendant. That on February 11, 1941, he had come to the town of Cache with Ray Seay. That he saw defendant, Jack Plaxico, in Cache. That Plaxico called him to the back end of his pickup truck and asked him if he knew where they could get any calves to where he, Plaxico, could make half price on them. That witness asked Plaxico who would take the blame if they got caught and Plaxico said he would. That witness then called Ray Seay over to the car and they asked Ray Seay if they could get any calves at his place to where the defendant could take them and make one-half profit on the calves. That after some conversation the witness and Ray agreed to have the calves in the barn at Ray Seay's place the next night by 9 o'clock. That after defendant left the witness and Ray Seay decided they would put the calves in the barn that night. That they took three of the Goodwin calves, put them in the barn and then drove to the defendant's house. That defendant was getting ready for bed, but stated he would be at Ray Seay's place in about three-quarters of an hour. That he left Ray Seay at the witness' brother's house while he took Ray's car and went on over to the place where the calves were left. That the defendant drove up to the yard, turned his lights out and then drove on down to the barn door. That the witness ran the calves into the truck and defendant drove back out in the yard and stopped. That

the witness and defendant then took some weeds and stuff and rubbed out the car tracks. That before the defendant left he gave the witness a check for $20. The check was identified and admitted in evidence. That the next day he and Ray Seay took the check to Joe Barger's filling station and cashed it and they divided the money.

Ray Seay told substantially the same story as that related by Ode Risinger.

Ernest Covington testified that about 8:30 a. m., February 12, 1941, he saw defendant at the sale barn in Frederick. Defendant had three good, white-faced calves. After some dickering with defendant, witness bought the calves for $47.50. That witness than ran the calves through the auction and they brought $64.50.

Tom Amyx, manager of the sale barn at Frederick, testified concerning the method of handling the sales and identified the check for $46.07 payable to A. J. Plaxico, the defendant, which was the sales price to Covington less the commission. The check was introduced in evidence and shows an endorsement of A. J. Plaxico.

R. P. Dunham testified that he bought the three calves that Jack Plaxico had brought to the sale for $64.50 when they went through the sales ring. That he thought that was a fair price for the calves.

Joe Barger testified that he cashed the $20 check given by defendant to Ode Risinger on February 12th. That Ode Risinger and Ray Seay came to his service station together, filled the car with gasoline and he gave them the difference between the cost of the gasoline and the $20 check.

L. L. Tomlinson, sheriff of Comanche county, testified that he received a call from the deputy sheriff at Fred-

erick with reference to some calves that had been brought to the sales ring by the defendant. That he drove to defendant's house and had a conversation with him about the calves. That defendant told him he got them from Ode Risinger. That he left defendant's premises as if to go talk to a man by the name of Sartain who had ridden to Frederick with defendant, but instead circled back towards the Risinger place to see whether defendant had gone there after his conversation with the witness. That they met defendant right at a bridge about 200 feet this side of Risinger's place. That he stopped the defendant and asked what he was doing there and defendant said he had come to the filling station to get some smoking tobacco. The filling station was closed. That the sheriff then said, "You passed by several places that handled smoking tobacco." That defendant did not say anything. That he then took him to town on investigation concerning the calf deal. On the way to town defendant told him he had given a $20 check to Risinger for the calves.

It was thereupon stipulated that defendant's bank account showed a balance on February 8, 1941, of $10.27. That on February 13, 1941, there was deposited to defendant's credit the sum of $40, and that on the 13th and 14th of February there were checks drawn against his account in the amount of $48.

The defense which was interposed was that the purchase of the calves was made by the defendant from Ode Risinger in good faith for the sum of $40. That $20 was paid in cash and a check given for $20.

Mrs. Jack Plaxico, wife of defendant, testified that she was with defendant in Cache when he was approached by Ode Risinger who told him he had some cattle for sale. That her husband did not get out of the car and go to the

back end, but talked to Risinger by the door. That Risinger came to the house that night while she was busy in the kitchen. That she could hear them talking about some cattle the man was willing to sell, but she did not hear all the conversation. That her husband left that evening and brought back some cattle which he took to the sale at Frederick the next morning. That Mr. Sartain, a neighbor, went with him to the sale.

B. F. Sartain testified that he lived four miles south and two miles west of Cache. That early in the morning of February 12, 1941, the defendant came by his house and he rode to Frederick to the sale barn with him. He traced the route which he and the defendant traveled going to Frederick and the road they traveled was not the main road usually followed in going from Cache to Frederick, but was a graded road which did not go through the town of Chattanooga.

Connie Hill testified that he was the auctioneer at the sales barn at Frederick. That he thought the $47.50 paid by Covington for the three Plaxico calves was a fair price and that the $64.50 paid at the sales ring by Dunham was an extra good price brought on by spirited bidding. That he became suspicious of the calves because they were extra good calves and should have been on the cows and he notified the officers at Frederick concerning his suspicions and they in turn called the sheriff at Lawton.

Clarence Cothren, by permission, was allowed to testify out of turn for the state. He saw defendant early in the morning of February 12th driving towards Chattanooga. That he was not on the main road, but was on what was known as the west road, which was a rough road. That it had rained a short time before that and the road

had not been graded. That the east road was a graded, gravel road going from Cache to Chattanooga and on to Frederick. That the defendant was driving a V-8 Ford pickup.

The defendant testified in his own behalf that he was approached by Ode Risinger in Cache about the sale of some calves. That about two hours later Risinger came to his house and told him he had the calves up in a barn and wanted to sell them. That he looked at the calves and after some dickering he agreed to pay $40 for them. That he gave Risinger $20 in cash and a check for $20. That he put the calves in his pickup and left them there in his yard the rest of the night. The next morning he drove to Frederick with Sartain to take the calves to the sales barn. That a short time after he arrived at the sales barn Covington approached and wanted to buy the calves and after some conversation he sold them to Covington for $47.50. That he did not talk to Ray Seay about the calves and did not know that Ray Seay was getting any of the money. His testimony in substance was that all his actions were in good faith.

The testimony of the daughter of defendant, given at a former trial, was read to the jury and it corroborated the testimony of her father about Risinger coming to his house and asking for him to come and look at the calves. She stated that Risinger said if he were interested to come on up and that if he were not he was going to see someone else as he needed the money.

22 O. S. 1941 § 742 provides:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient

if it merely show the commission of the offense or the circumstances thereof."

In the case of Hathcoat v. State, 71 Okla. Cr. 5, 107 P. 2d 825, the following rules of law, which had been laid down by many decisions of this court, were again reaffirmed, as shown by the syllabus which reads:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him with its commission.

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

"It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof.

"Where there is evidence in corroboration of an accomplice, tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury."

We have the following corroborating circumstances:

(1) The calves were loaded at night at the barn of Ray Seay on the Goodwin farm.

(2) Defendant knew that Ray Seay was living on the farm and looking after the Goodwin cattle.

(3) Ray Seay was not present when the calves were loaded.

(4) The route traveled by defendant in taking the calves to the sale at Frederick was over a rough country road until he passed the town of Chattanooga.

(5) Defendant, by his own admission, was dealing with Ode Risinger, a youth of 18 years whom he had known for some time.

(6) Defendant gave his check in the amount of $20 to Risinger for the calves.

(7) Defendant told Covington at the sales barn that he had purchased the calves for $35.

(8) Defendant told sheriff when he was first questioned that he had purchased the calves from Ode Risinger for $20.

(9) There were suspicious circumstances in connection with the defendant driving immediately to Ode Risinger's house after being first questioned by the sheriff and his explanation of his conduct.

(10) The defendant's possession and transportation of the stolen property was also a circumstance which, if unexplained, would have been sufficient to have sustained the conviction.

In Underwood v. State, 36 Okla. Cr. 21, 251 P. 507, 509, it is stated:

"The law prescribes no standard for the strength of the corroborating evidence, and there is a failure to corroborate only if there be no evidence legitimately having that effect."

In Haas v. State, 37 Okla. Cr. 335, 257 P. 1115, this court said:

"Where there is evidence in corroboration of an accomplice, tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury."

We have had two recent cases in which the facts were very similar to those herein involved and in which the convictions of the defendants were sustained. Mills v. State, 73 Okla. Cr. 98, 118 P. 2d 259; Rowland v. State, 75 Okla. Cr. 164, 129 P. 2d 609. If anything, the facts in the instant case are stronger than the facts in either of the two above cases. The corroborating evidence is stronger than that which this court held sufficient to sustain the conviction of the defendant Mills in Mills v. State, supra.

This court will not substitute its judgment on questions of fact or the weight of the evidence for that of the jury where there is competent evidence from which the jury might reasonably and logically find the guilt of the defendant, even though the evidence may be conflicting, or such that different inferences might reasonably be drawn therefrom, or even in cases where it might appear to this court that the evidence preponderates in favor of the defendant. That is one of the features of the jury system. Twelve jurors who saw the witnesses and heard their testimony are in a far better position to determine the facts than a member of this court, and their judgment should stand if the record is free from prejudicial statements or influence.

The judgment of the district court of Comanche county is affirmed.

BAREFOOT, J., concurs. DOYLE, J., not participating.