# TILSON O'DANE RUSHING v. STATE.

No. A-10787.   March 3, 1948.

(190 P. 2d 828.)

242

George Miskovsky and Rutherford H. Brett, both of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., and Warren H. Edwards, Co. Atty., of Oklahoma City, for defendant in error.

BAREFOOT, P. J.   Defendant, Tilson O'Dane Rushing, was charged with Herbert Brannon Martin, in the district court of Oklahoma county, with the crime of burglary in the second degree after former conviction of a felony; was tried, convicted and sentenced to serve a term of ten years in the State Penitentiary at McAlester, and has appealed.

For proper consideration of the questions presented in this appeal, it becomes necessary to give a short statement of the facts, as revealed by the record.

The defendant and Herbert Brannon Martin were charged with burglarizing the Viking Freight Company in Oklahoma City on September 18, 1945, and stealing therefrom $90 in money, a suit of clothes, a belt, and a Lions Club pin. Defendant was tried separately, and the jury on March 11, 1946, returned a verdict of guilty, assessing his punishment at ten years in the State Penitentiary. The first trial of defendant resulted in a hung jury, and this was the second trial.

The prior convictions in felony cases, alleged in the information, were in case No. 16,297, in the district court of Oklahoma county, in which the defendant was convicted of the crime of burglary in the second degree on February 18, 1944, and sentenced to the State Reformatory at Granite for a period of two years; and in case No. 16,-570, in the district court of Oklahoma county, in which he was convicted of the same crime, on February 15, 1944, and again sentenced to serve a term of two years in the State Reformatory at Granite.

The petition in error with case-made attached was filed in this court on September 19, 1946, and on September 26, 1946, counsel for defendant filed in this court an application for an order directing the district court of Oklahoma county to hear and determine a motion for new trial filed in that court, on the grounds of newly discovered evidence; and this court, on September 26, 1946, entered an order authorizing the district court of Oklahoma county to permit the filing of the motion for new trial, and to hear and determine the matters set forth in said motion, and, "that a proper record of the proceedings had

upon said hearing be prepared so that the same may be attached to the case-made now filed in connection with the appeal in the above-entitled and numbered cause."

This order was complied with, and a full and complete transcript of the proceedings in which the motion for a new trial was overruled by the trial court has been filed and both the original case-made and the transcript have been considered on this appeal.

The Attorney General filed a motion to dismiss the appeal in this case, for the reason that the defendant had left the state pending his appeal, without obtaining the consent of the court. This motion was presented at the time the case was orally argued, and the case was submitted on the motion to dismiss and on the merits.

After careful consideration of the facts and circumstances, we have decided that the motion to dismiss should be overruled, and the case decided on its merits.

The first proposition submitted for a reversal of this case is:

"A conviction upon the testimony of an alleged accomplice, uncorroborated by other independent evidence tending to connect the defendant with the commission of the offense, and which merely shows the commission of the crime charged and circumstances thereof, and merely tending to raise a suspicion of guilt, is insufficient."

This is not a new question in this court. We have had many cases in which this question was raised and we do not deem it necessary to enter into a detailed discussion of the cases and the law with reference thereto. Excerpts may be taken from the many cases which, if construed alone, would seem to sustain the position of the state or the defendant. It is only by an examination of the particular facts in each case and the application

of the law to those facts, that it may be correctly determined whether the accomplice has been properly corroborated. The statute with reference to the corroboration of an accomplice is Tit. 22 O. S. 1941 § 742, and is as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

It is an admitted fact that the witness Herbert Brannon Martin, who testified for the state in this case, was an accomplice. His testimony at the trial of defendant was that on the night of September 18, 1945, he and defendant entered and burglarized the Viking Freight Company, as alleged in the information. He testified as follows:

"Q. How old are you? A. Twenty-one. Q. When was your birthday? A. The 3rd of this month. Q. Do you know Tilson O'Dane Rushing? A. I do. Q. How long have you known him? A. About 11 or 12 years. Q. Where do you live? A. 1529 South Blackwelder. Q. And where are you now? A. I am upstairs in the county jail. Q. And how long have you been up there? A. Ever since the 1st of December, about seventy days, I guess. * * * Q. Previous to that, where had you been? A. California. Q. Do you recall September the 18th of 1945? A. Yes, I do. Q. Did you see Tilson O'Dane Rushing on that day? A. I did. Q. Where did you see him? A. I was coming uptown that day and I saw him uptown on that night. Q. Now, where did you see him uptown that day, if you know? A. Well, it was somewhere on Main street, we just met, I think. * * * Q. Now, where did you next see him that day, if you know? A. I saw him that night at the Treanon Ballroom. Q. About what time did you see him up there? A. About 10:30, some-

thing like that. Q. Did you talk with him? A. Yes, I did. Q. All right; What was said between you and he at that time, if anything? A. Well, that day, we had talked about making some money, and so, we looked at a place uptown and decided— * * * And we looked at this place over at the finance office; we talked a little, it was next to the building, and we looked at this finance office there and we didn't want to do anything about it, so that night, I saw him up to the Treanon and he asked me if I wanted to go some place else and make some money; I told him, well, I didn't know. I told him to ask the girl that I was with, so he talked to her about the deal and after he did, she said, 'No,' and so I told him, I would meet him later on, to keep her from knowing it, and I would go with him, and he said 'All right.' So I told him I would meet him about—after the Treanon closed and after I took my girl home, at the Public Market, and he said 'OK,' and I taken her home and then left her house and left with some friends of my wife's and went down to 15th and Agnew and walked on down to the market and he was waiting there and he was standing by the side of my present car, and jumped out from behind it and stopped and he was trying to scare me and we laughed about it, and so, he told me, he decided not to wait for me at the public market, but he would come on down to the house; so I told him 'OK,' we would go on over there, and we left my house and started over to the Liebman Ice Plant and were going to begin there and when we were going across the viaduct, he had the little pistol with him, and we got to talking about it and he shot at some lights with it and we went then over the viaduct and we got over the viaduct, we needed a hammer to get into the premises with it and there was a filling station there at the northwest side of it and we got a hammer out of that and went on over to Liebman's and we looked for the engineer and couldn't see him, so I said, 'OK, we will go on up now,' and we started up the ladder and as I started up, the engineer came out and asked us what we thought we was doing on that ladder, and so, I told him we was going up to take a bath

or a shower and asked him if it would be all right, and he said 'Yes,' and we got on top of the building and we told him it was too cold to take a shower, we wasn't going to take one; and he said 'OK, come on down,' and we left and got back down the ladder and had a few words with him; I forget what was said, and we left there and went back over the viaduct and we didn't know what we was going to do, so then, we decided we would burglarize the Viking Motor Line over there, so, we went around on the side of the building and looked it all over and there was a dock there and I remembered, I got up on the dock and I sat down by that window and I told him there was a catch on the window there that he could break the window and he could reach in and open the window and we could both go in that way, so I told him I would get him something to break the window with and he said, 'No, I will break it with this gun;' we got down and he dug a hole in the window and tilted the latch and opened the window and he went in, and then, I walked in; we walked around through the room where we went in at, and around through the dock, through a door and a lock on the inside and the safe, we walked over to the safe and got two boxes out of it and it had a bunch of envelopes and stuff in it, and we opened up the envelopes and finally, we got the money out of the envelopes and put it in our pockets, and when we started away or to leave, I had several pieces in there and he had a suit and we started and went back out the same way we had come in and started walking across the field there and got on up to the street, why, he told me he didn't want the suit, so, I told him I would take it home with me, and so, we went on down to the Rotary park then, and they have a little amphitheater there and by aid of the lights there, we divided the money there and we split $76 and I got $38 of it and I gave him back $38, and he went home.  Q. What time was that, your best judgment?  A. Well, I think that was about 2:30 or something like that; maybe around 3, about that, along in there.  Q. Now, where did you next see Rushing, if you know? * * *  A. Well, I called him and he met me at 29th and Robinson.

Q. What did you and he do then, if anything? A. We left 29th and Robinson, I told him that the law was looking for us, so we went on up on Broadway and paid down on a ticket to Los Angeles with a travel bureau. Q. Then, did anything else happen out there that day, did they or did they not? A. Well, we was sitting in the Oklahoma Tire & Supply Company and there was two officers came in and well, I guess they would arrest both of us, but O'Dane run. Mr. Miskovsky: Just a minute; that would be his conclusion here. The Court: Sustained. Q. Just tell what happened there, what you saw. A. Well, the officers came in the front door and O'Dane walked out alone and they started to run and I just walked off from the Oklahoma Tire & Supply. Q. And what did you do? A. I left and went to Pauls Valley and then out to Colorado. Q. From there, where did you go. A. I came back here and stayed overnight and then I went to Arizona. Q. Now, did you finally get married out there? A. Yes, sir, I did. Q. Then, where did you go from there? A. I went from Arizona to Los Angeles, California. Q. And when did you return to Oklahoma City, if you know? A. December the 30th. Q. And where did you go when you came to Oklahoma City? A. I went to my house and stayed there, it was about 11 o'clock I got in town and I stayed there until I was arrested there that night just about dark. Q. With whom do you live when you are here? A. My friend's parents, Mr. and Mrs. Gooch. Q. Now, I will hand you what's been marked State's Exhibit 4, for identification, and asked you if you have ever seen that before. A. Yes, I think so; yes. Q. Is that what you are talking about with reference to the window down there, is it or is it not? A. Yes, that's what he broke the window with. * * * Q. Did you ever own that gun, did you or did you not? A. No, I never. Q. Where is the first time you ever saw that gun, if you know? A. Well, I saw it when O'Dane Rushing had it on the 18th, that day uptown, and I saw him again with it that night at the Treanon, and he had it later on that night again. Q. You say you saw him with it at the Treanon? A. Yes, I did. Q. What was he doing with it at that time? If

you know? A. Well, when he came up there, he had the gun in the brief case with him and he was showing it to some of the kids what was standing there. Q. Now, you have a suspended sentence, don't you? A. Yes, I do. Q. And who is your attorney? A. Charlie Moss, Mr. Moss. Q. Have you or have you not been promised anything by any of the officers of Oklahoma county for your testimony here today? A. No. I haven't. Q. Now the girl you later married, what is her name, what was her name before you married her? A. Eunice Moore. * * * Q. And where did you marry her? A. Phoenix, Arizona. Q. When? A. October the 26th, 1945. Q. And she is your wife now? A. She is."

There was a long cross-examination of this witness, but no material facts were developed that were in conflict with the direct testimony hereinbefore set out.

It is contended by the state that the evidence of the witnesses Mrs. Wilma Jean Eales, Cecil Duncan and Herbert C. Judkins, a detective out of the city police department, was sufficient to corroborate that of the accomplice Martin. All three of these witnesses testified that they were present at a dance in the Treanon Ballroom on the night of September 18, 1945, the night the Viking Freight Company was burglarized; and that they saw the defendant Tilson O'Dane Rushing and the accomplice Herbert Martin at the dance hall between 10 and 10:30 that night.

The witness Mrs. Eales had known these parties for a number of years. She testified:

"Q. Did you or did you not hear any conversation between Tilson O'Dane Rushing and Herbert Martin upon that occasion, and just tell all, from the time, what you heard and so on, if anything. A. Well, O'Dane come in between 10 and 10:30, he walked up to Herbert and I was sitting at the table and I saw quite a few kids going around them, so I walked over to see what was going

on; O'Dane had a brief case and he had quite a few things in it, and he told Herbert he knew how to get some easy money, and Herbert said he would go with him, if it was all right with Eunice, and it was rather vague and that's about all I know."

"Eunice" was the girl Martin had accompanied to the dance hall, and whom he later married in Phoenix, Arizona.

The witness Cecil Duncan positively identified both the defendant and the witness Martin as being at the dance at the time indicated, and which was only a few hours before the robbery of the Viking Freight Company. He testified:

"Q. Tell the court and jury what you saw there, if anything, and what you heard. A. Well, I just saw O'-Dane come up there and he had a brief case and a gun and I didn't hear them say anything."

The witness Herbert C. Judkins testified that it was a part of his duty to police the Treanon Ballroom, and that he was there on the night of September 18, 1945. That he saw the defendant Tilson O'Dane Rushing there on several different occasions that night, and at about the time above indicated.

Bob Ewing testified that he had been on the police detective force for more than nine years. That he was acquainted with both the defendant and Martin. That on September 19, 1945, the day following the burglary of the Viking Freight Company, he and Walter Acord, a fellow-officer, after investigation, were looking for the defendant and Herbert Martin. About 1:30 or 2 o'clock in the afternoon they were passing the Oklahoma Tire & Supply Company store on North Broadway. They saw the defendant and Martin in the store. They started toward them and defendant went out the back door, and

Martin out at a side door. The witness followed the defendant out the back door and caught him about 60 or 70 feet from the door. Defendant had his right hand in his pocket, and witness pulled his gun and told defendant to get his hands out of his pocket and put them up. Defendant complied, and witness searched him, and found on him a pistol, money, pocketbook, and a box of 22 shells. The pistol was introduced in evidence, and was such as that described by the witness Martin in his testimony heretofore given. The witness placed defendant in jail and the co-defendant Martin escaped, going to Arizona, Colorado and California, as testified to by him, before returning to Oklahoma City.

Guy Bauguess testified that he was a jailor in Oklahoma county and had been for three years. That the defendant was in the Oklahoma county jail and had been for some time when Herbert Martin was placed in jail. They were in separate compartments. On the day Herbert Martin was placed in jail the defendant handed the witness a note with the request that he deliver it to Herbert Martin. This note was introduced in evidence, and was as follows:

"Herbert, what did you tell the detectives about me? O'Dane."

Fred Phillips also testified that he was a jailor in Oklahoma county, and had been for a period of three years. He testified that on the day Herbert Martin was placed in jail the defendant gave him a note and requested that he deliver it to Herbert. This note was also introduced in evidence, and was as follows:

"Herbert are you pleading guilty? Tell me everything so I'll know what to do. I havent admitted *being alive*. Dont sign anything if you haven't already. Send answer by jailer. O'Dane Rushing."

The defendant did not offer any witnesses in his behalf, and did not take the stand, which was his right, but he elected to stand on the evidence offered by the state.

As above stated, the question of the evidence being sufficient to corroborate the testimony of the accomplices is dependent upon that of each particular case, under the rules of law announced by this court in many cases contruing the statute above quoted.

It has been stated in many of the cases that the corroborating evidence does not have to constitute a separate and complete proof of the crime, but only that there should be some evidence of material facts in addition to the testimony of the accomplice tending to connect the defendant with the commission of the crime. The weight of the evidence is a question of fact for the determination of the jury. Defendant in his brief stresses the cases from this court which hold that it is not sufficient for this purpose merely to connect the defendant with the accomplice, or other person participating in the crime, but evidence independent of the testimony of the accomplice must tend to connect him with the crime itself, and not simply with its perpetrators. This statement is followed by the quotation:

"The corroborating evidence may be sufficient although by itself slight, but it is not sufficient if it merely tends to raise a suspicion of guilt."

While the words "not sufficient" are used, it does not state that evidence of the fact that defendant and the accomplice were together and in close proximity to the scene of the crime when it was committed, is not a circumstance for the consideration of the jury. And while this fact alone might not constitute sufficient corroboration, yet when considered by the jury or court in

connection with all the other facts and circumstances, it is sufficient to constitute that degree of corroboration required by the statute. Rogers v. State, 57 Okla. Cr. 294, 48 P. 2d 344; Kennedy v. State, 65 Okla. Cr. 77, 83 P. 2d 198; Cornett v. State, 42 Okla. Cr. 93, 274 P. 676; Wever v. State, 22 Okla. Cr. 414, 211 P. 1062; Holmes v. State, 52 Okla. Cr. 406, 5 P. 2d 770; Mitchell v. State, 59 Okla. Cr. 393, 60 P. 2d 627; Hinkle v. State, 55 Okla. Cr. 402, 32 P. 2d 96; Behne v. State, 55 Okla. Cr. 392, 31 P. 2d 621; Blumhoff v. State, 72 Okla. Cr. 339, 116 P. 2d 212; Scott v. State, 72 Okla. Cr. 305, 115 P. 2d 763; Hathcoat v. State, 71 Okla. Cr. 5, 107 P. 2d 825; Howard v. State, 70 Okla. Cr. 165, 105 P. 2d 440; Anderson v. State, 79 Okla. Cr. 194, 153 P. 2d 245. See, also, Cole v. State, 83 Okla. Cr. 254, 175 P. 2d 376; Tillman v. State, 82 Okla. Cr. 276, 169 P. 2d 223; Plaxico v. State, 78 Okla. Cr. 353, 148 P. 2d 201; Edson v. State, 77 Okla. Cr. 100, 139 P. 2d 198; Perry v. State, 74 Okla. Cr. 234, 125 P. 2d 219; Lucas v. State, 68 Okla. Cr. 359, 98 P. 2d 933.

In the Perry case, supra, it is said:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"This does not mean a separate and complete proof of a crime, but only that there should be some evidence of material facts in addition to the testimony of the accomplice tending to connect the defendant with the commission of the crime charged.

"Held, that the evidence is sufficient to corroborate the testimony of the accomplice. Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263; Wilkins v. State, 70 Okla. Cr. 1,

104 P. 2d 289; Hathcoat v. State, 71 Okla. Cr. 5, 107 P. 2d 825.".

It has often been held by this court that evidence to corroborate an accomplice may be by circumstantial evidence, as well as by direct testimony. Hamilton v. State, 79 Okla. Cr. 108, 152 P. 2d 119, and cases cited therein.

In the case at bar the evidence reveals several outstanding facts which tend to corroborate the evidence of the witness Martin. The defendant was seen at the Treanon Ballroom in company with the witness Martin a short time before the burglary was committed, by three disinterested witnesses. The defendant had in his possession a gun which the evidence revealed was used in the burglary, and which was found by the officers on the person of the defendant at the time of his arrest, the following day. Statements were made by the defendant to Martin at the dance hall that he "knew how to get some easy money" and that Martin told him that he "would go with him if it was all right with Eunice."

The evidence further reveals that defendant and Martin were together on the following day, and at that time, upon seeing the officers, whom they knew, approaching them, there was an attempted flight by the defendant. Proof of flight is permitted to be shown as circumstance of one's guilt, and this has been held to be a circumstance for the consideration of the jury or court, as to corroboration of an accomplice. Graham v. State, 80 Okla. Cr. 159, 157 P. 2d 758; Broyles v. State, 83 Okla. Cr. 83, 173 P. 2d 235.

In addition to the evidence above referred to, the two notes which were written by the defendant to the witness Martin on the day he was placed in jail and which have been quoted, were circumstances to be considered

by the court and jury as to the guilt of the defendant, and as corroborating testimony. These notes were signed by defendant, and he in no way denied that he wrote them. They could have been, and probably were, given great weight by the jury in determining the guilt of the defendant and his presence with the accomplice Martin at the time of the burglary, as alleged.

From the above statement we are of the opinion that the evidence in the instant case was sufficient to comply with the statute in the corroboration of the accomplice, Herbert Martin. The record does not reveal the reason Bill Sayers, the engineer at the Liebman Ice Plant, who saw both the defendant and Herbert Martin just before the burglary occurred, was not used as a witness by the state or the defendant. We, of course, cannot surmise what his testimony would have been, and in the absence of such testimony, we express no opinion on the matter. It would have been better if the jury had been permitted to hear his testimony.

The second proposition presented by defendant is that the court erred in refusing to grant a new trial on the grounds of newly discovered evidence.

Reference has heretofore been made to the procedure followed in presenting this motion for new trial. The principal evidence relied upon was that Herbert Martin, the accomplice and codefendant who had been released from jail on his own bond after the trial of defendant, went to the office of defendant's attorney on September 16, 1946, three days before the petition in error and case-made were filed for appeal in this court, and, as stated in the motion, "made a voluntary, verified statement," in which he exonerated the defendant of any participation in the crime of burglarizing the Viking Freight Com-

pany on the night of September 18, 1945. He further stated that the window which was broken at the time of the burglary was not broken by defendant with a gun, as testified by him, but that he broke the window with a screw driver which he left at the Viking Freight Company office on the night of the burglary.

At the hearing of the motion for new trial by the trial court, upon order of this court evidence was taken which has been transcribed and is now before us for consideration together with the original case-made. The evidence chiefly concerned the finding of a screw driver by Mr. E. W. Williams, the manager of the Viking Freight Company at his office on the morning following the burglary. Mr. Williams had not delivered this screw driver or called it to the attention of the officers until in February, 1946, just prior to the trial of the defendant the second time, when the assistant county attorney with other officers and the witness Herbert Martin went to the office of the Viking Freight Company for the purpose of re-enacting the scene of the crime. There is very little, if any, conflict in the testimony with reference to this matter, and as we view the case, it is of very little importance. Mr. Williams, the officers present, and the assistant county attorney all testified that Mr. Williams produced the screw driver and told of finding it in his office the morning after the burglary, and offered it to the assistant county attorney "if it means anything to you"; and that the assistant county attorney, after a conference with the witness Martin, said, "Mr. Williams, you can just keep the screw driver as far as I am concerned, it has no place in this lawsuit." Mr. Williams, the officers and other witnesses who heard this conversation, all testified in effect to the words used in the conversation. We do not consider this conversation

of any material value. The assistant county attorney showed no disposition on his part to suppress the introduction of any evidence in the trial of the case. He was only relying on the evidence given him by the witness Martin and as he testified to at the trial of the case.

As to the repudiation by the witness Herbert Martin of the testimony given by him at the trial of this case long after he had testified and had been released on his own recognizance, it may be stated that the county attorney had no opportunity to cross-examine him as to this statement. The statement is in form of interrogatories, taken in the office of the attorney for defendant and sworn to by the witness Martin. There was no opportunity for cross-examination. Soon after the statement was made, Martin fled and so far as the record is concerned, has never been apprehended. On the sworn statement he was asked: "Q. Was anyone else with you when you burglarized the Viking Truck Lines?" And his answer was: "I don't want to implicate anyone else."

It was not insisted that he answer this question. If he had been under proper cross-examination he could have been forced to answer. He had stated that he wanted to right a wrong he had done the defendant, yet he was not willing to tell the whole truth. The trial court had a right to consider all of these facts in passing upon the motion for new trial.

The general rule is that in passing upon a motion for new trial on the grounds of newly discovered evidence, the question is addressed to the sound discretion of the trial court, and ordinarily the ruling of the trial court will not be disturbed on appeal, unless there is a clear, definite and positive abuse of discretion, and it is

generally presumed that the trial court exercised proper judgment and discretion.

This rule has special reference to cases like this, where one has made a statement or affidavit that the testimony given by him at a former trial was not true and that he committed perjury at the time he so testified. A strong reason for the above rule is set forth in the case of Ryal v. State, 16 Okla. Cr. 266, 182 P. 253, 259, quoting from the case of People v. Tallmadge, 114 Cal. 427, 46 P. 282:

"Applications on the ground of newly discovered evidence are addressed to the discretion of the trial court, and its action will not be set aside except for an abuse of such discretion, and the presumption is that the discretion was properly exercised; and it has been repeatedly held by this court that such applications are to be regarded with disfavor. Hayne on New Trial and Appeal, par. 87, and cases there cited, People v. Sutton, 73 Cal. 243, 15 P. 86; People v. Freemen, 92 Cal. 359, 28 P. 261. It cannot be said that, as a matter of law, a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony; if that were so, justice would be defeated in many grave cases. Notwithstanding such an affidavit, the appellate court will rest largely upon the discretion of the judge who heard the trial, and will not disturb his ruling except in clear cases of abuse of discretion."

See, also, Wells v. State, 16 Okla. Cr. 461, 184 P. 465; Whitworth v. State, 80 Okla. Cr. 239, 158 P. 2d 364, 159 P. 2d 277; Armstrong v. State, 61 Okla. Cr. 352, 68 P. 2d 114; Finklestein v. State, 68 Okla. Cr. 341, 99 P. 2d 167.

In the Whitworth case, supra, it is said:

"A motion for new trial was made upon grounds of newly discovered evidence, and supported by affidavit

of defendant's brother (who was a codefendant and had been convicted and was serving a sentence in the State Penitentiary), that affiant and another committed the crime and that defendant was not present and had no knowledge thereof, affiant having previously testified at the trial of defendant that he had no part in the commission of the crime, Held: that such showing does not entitle the defendant to a new trial as a matter of right, but calls into exercise the sound discretion of the court, and such motion should be overruled unless the trial court believes that such recantation is probably true, and that another trial might result in the acquittal of the defendant.

"The practice of granting new trials upon affidavits of persons who have been convicted and then change their testimony, admitting that they had committed perjury, is not looked upon with favor by the courts."

For the reasons herein stated, the judgment of the district court of Oklahoma county is affirmed.

JONES, J., concurs. BRETT, J., not participating.